**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
           *Plaintiff-Appellee,*

v.

JAMES H. TUFF,
           *Defendant-Appellant.*

No. 05-35195

D.C. No.
CV-04-00570-TSZ

OPINION

Appeal from the United States District Court
for the Western District of Washington
Thomas S. Zilly, District Judge, Presiding

Argued and Submitted
October 26, 2006—Seattle, Washington

Filed December 4, 2006

Before: Alfred T. Goodwin and Alex Kozinski,
Circuit Judges, and Milton I. Shadur,* Senior District Judge.

Opinion by Judge Goodwin

---

*The Honorable Milton I. Shadur, Senior United States District Judge
for the Northern District of Illinois, sitting by designation.

19019

**COUNSEL**

Don Paul Badgley, Badgley-Mullins Law Group, Seattle, Washington, for the defendant-appellant.

Michael J. Haungs, Tax Division, Department of Justice, Washington, D.C., for the plaintiff-appellee.

**OPINION**

GOODWIN, Circuit Judge:

James H. Tuff ("Tuff") appeals the summary judgment granted the United States in its action to recover $208,513.20 refunded to Tuff by the Internal Revenue Service ("IRS") in connection with stock options Tuff exercised in 1999 through a margin loan from Morgan Stanley. We affirm the judgment.

## I.   BACKGROUND

The appeal turns on whether Tuff received income in the form of shares of stock when he exercised his options, or when Morgan Stanley liquidated the shares after their value had declined.

The material facts are not in dispute. Tuff was employed by RealNetworks, Inc., at a management level, and was classified as a corporate insider who could sell RealNetworks shares only during open trading windows approved by the company. As part of his compensation package Tuff received stock options, which he exercised twice in 1999 to purchase Real-Networks shares that had a total market value at the time of purchase of $460,093.75. The exercise, or "strike," price of these shares was $6,137.00, making the difference, or spread, between their market value and exercise price $453,956.75.

Tuff financed these purchases by borrowing from Morgan Stanley, writing checks to RealNetworks from his Morgan Stanley account to cover both the strike price and federal withholding taxes each time he exercised an option. The shares were deposited in an account in Tuff's name, and Tuff became the registered owner of the stock. He had the right to vote the stock, receive dividends, and pledge the stock as collateral for a loan. Taking advantage of these rights, Tuff pledged the stock as collateral pursuant to a client account agreement with Morgan Stanley. The Agreement provided:

> You agree at all times to maintain such margins for your account with Dean Witter Reynolds as required by law or custom, or as we may deem necessary or advisable. You also promise to discharge your obligations to Dean Witter Reynolds upon demand; this obligation survives termination of your account with Dean Witter Reynolds.[1]

Under the Agreement, Morgan Stanley had the right to liquidate Tuff's RealNetworks shares, through margin calls, when necessary to maintain collateral in Tuff's account equal to the outstanding debt multiplied by 1.33. Prior to the sale of any of his RealNetworks shares in a margin call, however, Tuff had the option to deposit cash or other securities to maintain his account margin and still retain all his RealNetworks shares. After Tuff received margin calls in 1999 and did not deposit additional equity in his account, Morgan Stanley sold 2,200 of his RealNetworks shares; 1,200 during blackout periods when Tuff was precluded from trading RealNetworks shares.

Tuff and his wife filed a Form 1040 joint income tax return for tax year 1999, reporting $540,543.00 of Form W-2 income

---

[1]Although the agreement refers to Dean Witter Reynolds, Tuff's account was with Morgan Stanley Dean Witter & Co. and certain services were offered through Dean Witter Reynolds, Inc.

from RealNetworks, which represented Tuff's salary plus the aggregate spread from the exercise of stock options described above. In January, 2002, the Tuffs filed a Form 1040X amended return/claim for refund, asserting that no income arose when Tuff exercised the options in 1999, and listing his W-2 income as $86,586.00, a difference of $453,957.00 from the original return. The Form 1040X also claimed a refund of the withholding tax Tuff paid RealNetworks upon exercising the options. After issuing the Tuffs a check for $208,513.20 in March 2002, the IRS reconsidered its position and sought to recover the refund. This action followed.

On the parties' cross-motions for summary judgment, the district court rejected Tuff's primary argument: that his receipt of RealNetworks shares was not taxable in 1999 when he exercised his options, but only later when Morgan Stanley sold them to restore the margin. The district court also rejected Tuff's alternative argument that he should recognize ordinary, rather than capital, loss for the decline in the fair market value of his RealNetworks shares at the end of each blackout period, as well as each time Morgan Stanley sold the shares during blackout periods. The district court, as noted, granted summary judgment in favor of the United States and against Tuff in the amount of $208,513.20, plus interest.

## II. THE TAXABLE EVENT

[1] A question of first impression in this circuit: When an employee exercises a non-qualified stock option[2] granted by the employer to purchase shares with money borrowed from a third party, pledging the shares as collateral for the loan, is the property "transferred" and "substantially vested" for tax

---

[2]Statutory stock options are compensatory options that meet certain criteria and are treated differently under the Internal Revenue Code. *See* I.R.C. § 422. Options that do not meet these requirements, such as the RealNetworks options in this case, are nonstatutory, or nonqualified, stock options. *Cramer v. Comm'r*, 64 F.3d 1406, 1408-09 (9th Cir. 1995).

purposes at the time the option is exercised, or at the time the shares are later liquidated? Citing no relevant authority, Tuff contends that in these circumstances no taxable transfer occurs when the option is exercised. An overview of the statutory and regulatory provisions governing the taxation of stock options is useful to understand Tuff's arguments.

## A. Statutory and Regulatory Framework for Taxation of Stock Options

**[2]** When an employee receives a non-qualified stock option that does not have a readily ascertainable fair market value, as was the case with the options at issue, the receipt of the option generally is not taxable. I.R.C. § 83(e)(3). Rather, the employee is taxed upon exercising the option and receiving shares if two conditions are met. First, the shares must be transferred to the employee. Under the applicable regulations, a transfer occurs when the employee acquires a beneficial ownership interest in the shares. 26 C.F.R. § 1.83-3(a)(1). Second, they must be substantially vested in the employee. I.R.C. § 83(a); 26 C.F.R. § 1.83-1(a). Shares are substantially vested in the employee when they are either transferable or not subject to a substantial risk of forfeiture. 26 C.F.R. § 1.83-3(b). If both conditions are met, the employee must recognize income in the amount by which the shares' fair market value exceeds the exercise price paid. I.R.C. § 83(a).

Whether a risk of forfeiture is substantial depends on the facts and circumstances. 26 C.F.R. § 1.83-3(c)(1). Shares (or any other property transferred in connection with the performance of services) are subject to a substantial risk of forfeiture when the owner's rights to their full enjoyment are conditioned upon any person's future performance of substantial services. I.R.C. § 83(c)(1). Property is transferable if the employee can sell, assign, or pledge his or her interest in the property to a person other than the transferor, and this third-party transferee is not required to give up the property or its

value if a substantial risk of forfeiture later materializes. 26 C.F.R. § 1.83-3(d).

**[3]** In this case the RealNetworks shares were transferred to and substantially vested in Tuff when he exercised his stock options. RealNetworks issued the shares to Tuff, who then held legal title to the shares and was entitled to receive dividends. After Tuff exercised his options, RealNetworks imposed no further conditions upon his ownership interest. He had the right to vote the shares. He had the right immediately to sell the shares, because he exercised his options during open trading windows. Tuff had the right to pledge the shares as collateral, and indeed did so to secure his loan from Morgan Stanley.

**[4]** Under the general rules described above, the transfer of the stock to Tuff in 1999 was a taxable event. Seeking to avoid this result, Tuff argues that under the Morgan Stanley agreement, he received only another option rather than the shares themselves.

## B. Exception for Certain Transfers Treated as the Grant of an Option

**[5]** Treasury Regulation § 1.83-3(a)(2) ("section 1.83-3(a)(2)") provides that income is not recognized when a "transfer" of property occurs by treating the exercise of some stock options as the grant of another option, rather than a transfer of shares. Section 1.83-3(a)(2) states:

> [I]f the amount paid for the transfer of property is an indebtedness secured by the transferred property, on which there is no personal liability to pay all or a substantial part of such indebtedness, such transaction may be in substance the same as the grant of an option. The determination of the substance of the transaction shall be based upon all the facts and circumstances. The factors to be taken into account

include the type of property involved, the extent to which the risk that the property will decline in value has been transferred, and the likelihood that the purchase price will, in fact, be paid.

26 C.F.R. § 1.83-3(a)(2).

The regulations illustrate how section 1.83-3(a)(2) operates in this example:

Example (2). On November 17, 1972, W sells to E 100 shares of stock in W corporation with a fair market value of $10,000 in exchange for a $10,000 note without personal liability. The note requires E to make yearly payments of $2,000 commencing in 1973. E collects the dividends, votes the stock and pays the interest on the note. However, he makes no payments toward the face amount of the note. Because E has no personal liability on the note, and since E is making no payments towards the face amount of the note, the likelihood of E paying the full purchase price is in substantial doubt. As a result E has not incurred the risks of a beneficial owner that the value of the stock will decline. Therefore, no transfer of the stock has occurred on November 17, 1972, but an option to purchase the stock has been granted to E.

26 C.F.R. § 1.83-3(a)(7) Example (2) ("Example (2)").

Attempting to fit this example, Tuff argues that a transfer occurs within the meaning of I.R.C. § 83 only when an employee places his own capital "at risk." Because he paid for his options with borrowed money, using debt secured by the stock, Tuff argues he had no capital at risk, and therefore no

transfer occurred until the RealNetworks stock was later sold to satisfy Morgan Stanley margin calls. We disagree.[3]

### C.  Tuff's Stock Purchases Financed by Third Party Margin Debt Do Not Qualify for the Treasury Regulation § 1.83(a)(2) Exception

[6] Section 1.83-3(a)(2) states that a transfer of property may be the same in substance as the grant of option when the amount paid in exchange for property "is an indebtedness." In this case, RealNetworks transferred stock to Tuff and was paid in full. RealNetworks never held a note, or any other form of indebtedness, in exchange for the stock. Nonetheless, Tuff contends that section 1.83-3(a)(2) and Example (2) turn on what an employee pays for property, rather than on what the employer receives. Therefore, Tuff argues, if an employee borrows money to purchase stock, without placing his own capital, other than the stock, at risk, no transfer has occurred within the meaning of I.R.C. § 83. This is nonsense.

Example (2) does not address the source the employee chooses to fund the payment or what an employee places at risk. Instead, Example (2) illustrates how a transaction styled as a sale operates, in substance, to grant an option to purchase property. Rather than giving the employee an option to purchase stock at a set price for a set time, the employer in Example (2) actually transfers stock to the employee in exchange for a note. However, the structure of the transaction allows the employee to choose whether to finalize the exchange by paying on the debt. In substance, the employer

---

[3]Although we appear to be the first court of appeals to address these arguments, we note that both the United States Court of Federal Claims and the United States Tax Court have recently considered, and rejected, many of the same arguments Tuff urges here. *See Palahnuk v. United States*, 70 Fed. Cl. 87 (2006); *Racine v. Comm'r*, T.C.M. 2006-162, 2006 WL 2346444 (2006); *Hilen v. Comm'r*, T.C.M. 2005-226, 2005 WL 2387488 (2005). We largely agree with the analysis undertaken by these courts.

has created, and the employee holds, an option to purchase the stock at a later time. Contrary to Tuff's arguments, whether an employee has capital at risk is entirely irrelevant to the transaction in Example (2). Instead, Example (2) is concerned with whether an employer has in substance created an option to purchase property.

**[7]** Therefore, when examining the similarity of Example (2) to Tuff's purchases, the critical inquiry is what RealNetworks transferred and when it received payment, not how Tuff financed his purchases. *See Palahnuk v. United States*, 70 Fed. Cl. 87, 91-92 (2006).

**[8]** In Example (2), it is uncertain whether the employer will receive the full purchase price, and equally uncertain whether the employer will transfer unconditional ownership of the stock. In Tuff's case, unlike Example (2), RealNetworks received the full purchase price of the stock in exchange for transferring unconditional ownership to Tuff. Although Tuff used debt to exercise his options, he borrowed the money from Morgan Stanley, rather than paying by incurring debt to RealNetworks. If he failed to pay the loan, his shares were subject to forfeiture to Morgan Stanley, not to RealNetworks. In light of these fundamental differences between the instant case and the hypothetical posed in Example (2), we reject Tuff's argument that financing the exercise of stock options with third party margin debt is in any way similar to the alternative method of granting employee stock options described in Example (2).

Not only do Tuff's purchases fall outside the ambit of Example (2), but consideration of all the facts and circumstances confirms they are not in substance the same as the grant of an option under 26 C.F.R. § 1.83-3(a)(2). As to the first factor, Tuff held title to the publicly-trades shares, had the right to receive dividends, and could vote, sell, and pledge the shares. Tuff in fact did pledge the shares as collateral for the margin loan from Morgan Stanley. In these circumstances,

this factor weighs against a claim that Tuff's purchases were in any real way similar to the grant of an option.

The second factor in section 1.83-3(a)(2) considers the extent to which the risk of decline in the value of the property has been transferred. Tuff argues that he had no capital at risk because under the Agreement with Morgan Stanley, if the collateral in his account fell below the debt balance multiplied by 1.33, Morgan Stanley would sell the shares to satisfy Tuff's debt and thus Tuff would avoid the possibility of a deficiency ever arising. Thus, Tuff contends, he did not assume the risk that the value of his stock would decline, and therefore that risk was never transferred. He is wrong.

**[9]** Tuff's "capital at risk" arguments, and the structure of his Agreement with Morgan Stanley, are entirely beside the point. The regulation does not require that the risk of decline in value be transferred *to and permanently vested in the employee*, but rather considers only whether it has been transferred *from the employer*. 26 C.F.R. § 1.83-3(a)(2). That Tuff may have later shifted this risk to Morgan Stanley has no bearing on our inquiry, and we need not entertain Tuff's arguments under I.R.C. § 465 that his debt to Morgan Stanley was in the nature of non-recourse debt for which he had no personal responsibility.[4] In this case RealNetworks transferred the shares to Tuff unconditionally, and with them, all risk that they might decline in value. The second factor thus also weighs against concluding that Tuff's purchases were in substance the same as the grant of an option.

---

[4]Moreover, Tuff did bear some risk that the RealNetworks shares would decline in value. The Agreement provided that if the value of the collateral in Tuff's account fell below a certain level, he would be required to deposit additional assets or Morgan Stanley would sell RealNetworks shares to satisfy the debt. Because this could occur only if the stock declined in value, Tuff did bear some risk that the stock value would decline. Furthermore, language in the Agreement made Tuff "personally liable for any deficiency remaining" after Morgan Stanley sold the Real-Networks shares.

**[10]** The final factor concerns the likelihood that the purchase price will be paid. In this case Tuff paid the purchase price in full to RealNetworks upon exercising his options, thereby extinguishing any possibility that his purchases could be treated as the grant of an option.

**[11]** In light of these facts and circumstances, Tuff's exercise of RealNetworks stock options in 1999 were not similar in substance to the grant of a stock option, and therefore 26 C.F.R. § 1.83-3(a)(2) does not control this issue. Accordingly, we hold that a taxable transfer of property within the meaning of I.R.C. § 83 occurred each time Tuff exercised his RealNetworks options.

## III. BLACKOUT PERIOD AND RECALCULATION

Tuff urges alternatively that he is entitled to have his case remanded in order for the district court to recalculate his tax liability incrementally as of the date each blackout period lapsed. Tuff believes that a unique set of factors allows him to take advantage of 26 C.F.R. § 1.83-1(e), which states that:

> If a person is taxable under section 83(a) when the property transferred becomes substantially vested and thereafter the person's beneficial interest in such property is nevertheless *forfeited pursuant to a lapse restriction*, any loss incurred by such person (but not by a beneficiary of such person) upon such forfeiture shall be an ordinary loss to the extent the basis in such property has been increased as a result of the recognition of income by such person under section 83(a) with respect to such property.

26 C.F.R. § 1.83-1(e) (emphasis added).

Tuff argues that two different types of events occurred while he owned the RealNetworks stock at issue which allow him to utilize the benefit of 26 C.F.R. § 1.83-1(e). First, he

argues that the mere lapse of a blackout period is a taxable event that "require[s]" him to recognize ordinary, as opposed to capital, loss because the risk of loss in the market value of his RealNetworks stock during blackout periods, coupled with the prohibition on sale during such periods, creates a substantial risk of forfeiture. Second, Tuff argues that sales of his RealNetworks stock by Morgan Stanley during blackout periods also "require[s]" him to recognize ordinary loss, because his property was forfeited pursuant to a lapse restriction. He cites no relevant authority for this proposition, and we have found none.

**[12]** Defining a few key terms is necessary. First, 26 C.F.R. § 1.83-3(i) defines a lapse restriction as "a restriction other than a nonlapse restriction as defined in paragraph (h) of this section, and includes (but is not limited to) a restriction that carries a substantial risk of forfeiture." In other words, it is a *temporary* restriction that carries a substantial risk of forfeiture. Second, "[a] substantial risk of forfeiture exists where rights in property that are transferred are conditioned, directly or indirectly, upon the future performance (or refraining from performance) of substantial services by any person, or *occurrence of a condition related to a purpose of the transfer*, and the possibility of forfeiture is substantial if such condition is not satisfied." 26 C.F.R. § 1.83-3(c)(1) (emphasis added). Importantly, however, "[t]he risk that the value of the property will decline during a certain period of time does not constitute a substantial risk of forfeiture." *Id.*

### A. The Mere Lapse of a Blackout Period is not a Taxable Event Because a Blackout Period is not a Lapse Restriction

**[13]** Tuff's first argument can be disposed of quickly. Tuff alleges that the blackout periods are a lapse restriction because, if he were to violate the restriction and sell his stock during a blackout period, the possibility that his stock would be forfeited is substantial. In virtually every example provided

in the regulations, however, the occurrence of the condition creating a substantial risk of forfeiture is related, as the regulation requires, to the initial transfer of the property. Section 1.83-3(c)(2) clearly illustrates this important distinction which Tuff ignores:

> Where an employee receives property from an employer subject to a requirement that it be returned if the total earnings of the employer do not increase, such property is subject to a substantial risk of forfeiture. On the other hand, requirements that the property be returned to the employer if the employee is discharged for cause or for committing a crime will not be considered to result in a substantial risk of forfeiture.

The first example is a lapse restriction because the condition, increased earnings, is related to the likely purpose of the transfer, to motivate the employee to work hard. The second example is not a lapse restriction because it is difficult to conceive of a way in which the condition, termination for cause or commission of a crime, could be related to the purpose of any transfer.

[14] The facts of this case are far more similar to the second example than the first. Here, the occurrence of the condition allegedly creating a substantial risk of forfeiture, the selling of stock during a blackout period, is not at all related to the purpose of the transfer. A blackout period is used to avoid the appearance of impropriety with respect to insider trading, and Tuff makes no effort to show how this condition could be related to the purpose of any stock transfer. A major portion of Tuff's argument that the blackout periods create a substantial risk of forfeiture is that they caused him to suffer a loss in the market value of his RealNetworks stock while he was prohibited from selling them. As noted, however, the definition of substantial risk of forfeiture expressly excludes the

risk that the property will decline in value. *See* 26 C.F.R. § 1.83-3(c)(1).

Tuff also attempts to demonstrate that the blackout periods create a substantial risk of forfeiture by way of a comparative analogy to I.R.C. § 83(c)(3).[5] According to Tuff, because Congress has determined that a civil suit pursuant to § 16(b) of the Securities Exchange Act of 1934 amounts to a substantial risk of forfeiture, so too should civil suits resulting from sales of stock during blackout periods. This argument misses the point entirely.

By enacting I.R.C. § 83(c)(3), Congress demonstrated that civil suits are not generically covered by I.R.C. § 83. Contrary to Tuff's argument, this indicates that for a civil violation to be considered a substantial risk of forfeiture, Congress must act specifically to include it within the scope of I.R.C. § 83. *See, e.g., United States v. Lopez-Perera*, 438 F.3d 932, 936 (9th Cir. 2006) (explaining that when Congress demonstrates its understanding of the meaning of a statute through the enactment of new provisions, that congressionally-ratified meaning should be applied by the courts). Congress has not amended I.R.C. § 83 to include civil suits for blackout period violations in the definition of substantial risk of forfeiture, and we will not speculate on a hypothetical application.

### B. Morgan Stanley's Sale of Tuff's Shares Does Not Satisfy the Requirements of 26 C.F.R. § 1.83-1(e)

[15] The second of Tuff's arguments is disposed of even more quickly. According to Tuff, because Morgan Stanley sold his RealNetworks shares in a margin call during a blackout period, his RealNetworks shares were forfeited pursuant

---

[5]I.R.C. § 83(c)(3) provides that where the sale of property at a profit could subject a person to suit under section 16(b) of the Securities Exchange Act of 1934, the person's rights in the property are both "subject to a substantial risk of forfeiture," and "not transferable."

to a lapse restriction. This argument rests on Tuff's conception of the blackout period as a "lapse restriction." If we were to assume *arguendo* that a blackout period could be considered a lapse restriction, Tuff's argument fails because he did not forfeit his RealNetworks stock *pursuant* to a lapse restriction, but pursuant to the Agreement he freely entered into with Morgan Stanley. Tuff could have paid down the debt he owed Morgan Stanley in order to satisfy the margin requirements. Had he done so, Tuff would have been able to keep all his RealNetworks shares, the blackout period notwithstanding. In fact, the purpose of the blackout periods was to ensure that Tuff *retained* his RealNetworks stock for the duration of the blackout period, not to serve as a means to forfeit the shares. Tuff in effect asks this court to hold that a blackout period has the exact opposite effect of its intended purpose. We decline to do so.

## IV.  CONCLUSION

We affirm the district court's judgment with respect to both of Tuff's grounds of appeal. The taxable transfers occurred when Tuff exercised his options, and 26 C.F.R. § 1.83-1(e) does not allow recognition of ordinary losses merely because the taxpayer's employer imposes blackout periods to guard against insider trading.

**AFFIRMED**