T.C. Memo. 2007-123

UNITED STATES TAX COURT

WALTER AND SUSAN MOORE, Petitioners $\underline{v}$.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 12106-05.              Filed May 17, 2007.

Brian Isaacson and Duncan Turner (specially recognized), for petitioners.

Kirk M. Paxson and Julie Payne, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

LARO, Judge:  Petitioners petitioned the Court to redetermine respondent's determination of a $810,805 deficiency in their 2002 Federal income tax and a $162,161 accuracy-related

penalty under section 6662(a).[1]  We decide primarily whether Susan Moore (petitioner) realized income in 2002 when she exercised stock options received from her employer Cell Therapeutics, Inc. (CTI).  We hold she did.  We also decide whether petitioners are liable for the accuracy-related penalty determined by respondent under section 6662(a).  We hold they are not.

FINDINGS OF FACT

Some facts were stipulated or contained in the exhibits submitted therewith.  We find the facts accordingly.  Petitioners are husband and wife, and they resided in Hansville, Washington, when their petition was filed.

A.  Petitioner's Relationship With CTI Before January 13, 2001

CTI hired petitioner as a compensation consultant in January 1993, and she continued to work for CTI as a full-time employee through January 12, 2001.  Before working for CTI, petitioner had earned a bachelor's degree in business administration, and she had worked for more than 10 years in various capacities (e.g., compensation manager, director of human resources) for various other employers.  Petitioner is certified by the American Compensation Society as a professional in the field of compensation.

---

[1] Unless otherwise indicated, section references are to the applicable versions of the Internal Revenue Code.

Two months after petitioner began working for CTI, CTI promoted her to its office of vice president of human resources. In 1995, CTI promoted her further to its office of executive vice president of human resource development. In 1999, CTI expanded petitioner's responsibilities as executive vice president to head CTI's corporate communications department in addition to its human resource department. Petitioner reported directly to CTI's chief executive officer (CEO), Dr. James Bianco (Dr. Bianco), and she served on CTI's strategic management team. The strategic management team was the top level of CTI, and it consisted of the CEO and all of the executive vice presidents of CTI's major functional areas.

CTI was a private corporation when petitioner first began working for it, and it later became a public corporation while she was affiliated with it. During each year that petitioner was affiliated with CTI, CTI employed between 100 and 500 individuals.

1. Stock Option Grants

As part of her compensation package, CTI gave petitioner options to purchase CTI common stock. Each option allowed petitioner to purchase a specified number of shares of CTI common stock at a specified price.

a.  <u>First Options</u>

Petitioner was granted options to purchase 20,000 shares and 10,000 shares of CTI common stock at $4.50 per share under the CTI 1992 Stock Option Plan Incentive Stock Option Agreement entered into as of December 20, 1993.  The agreement pertaining to these options contained the following recital:

<u>Termination of Option</u>.

A vested Option shall terminate, to the extent not previously exercised, upon the occurrence of one of the following events:

(i)  ten (10) years from the date of grant; or 12/20/03;

(ii) the expiration of ninety (90) days from the date of Optionee's termination of employment with the Company for any reason other than death or disability (as defined in the Plan), (unless the exercise period is extended by the Plan Administrator until a date not later than the expiration date of the Option) * * *

b.  <u>Second Options</u>

Petitioner was granted options to purchase 70,000 shares and 75,000 shares of CTI common stock at $3.35 per share under the CTI 1994 Equity Incentive Plan Incentive Stock Option Agreements entered into as of December 5, 1995, and November 7, 1996, respectively.  The agreement pertaining to the grant of the option to purchase the 70,000 shares contained the following recital:

<u>Termination of Option</u>.

A vested Option shall terminate, to the extent not previously exercised, upon the occurrence of one of the following events:

(i) ten (10) years from the date of grant; or 12/05/05;

(ii) the expiration of three (3) months from the date of Optionee's termination of employment or service with the Company for any reason other than death or because Optionee becomes disabled (within the meaning of Section 22(e)(3) of the Code) (unless the exercise period is extended by the Committee until a date not later than the expiration date of the Option) * * *

The agreement pertaining to the grant of the option to purchase the 75,000 shares contained the following recital:

<u>Termination of Option</u>.

A vested Option shall terminate, to the extent not previously exercised, upon the occurrence of one of the following events:

(i) ten (10) years from the date of grant; or 11/07/06;

(ii) the expiration of three (3) months from the date of Optionee's termination of employment or service with the Company for any reason other than death or because Optionee becomes disabled (within the meaning of Section 22(e)(3) of the Code) (unless the exercise period is extended by the Committee until a date not later than the expiration date of the Option) * * *

c. <u>Third Option</u>

Petitioner was granted an option to purchase 27,500 shares of CTI common stock at $16.0625 per share under the CTI 1994 Equity Incentive Plan Incentive Stock Option Agreement entered

into as of December 9, 1997.  The agreement pertaining to this option contained the following recital:

Termination of Option.

A vested Option shall terminate, to the extent not previously exercised, upon the occurrence of one of the following events:

(i)  ten (10) years from the date of grant; or 12/09/07;

(ii) the expiration of three (3) months from the date of Optionee's termination of employment with the Company for any reason other than death or because Optionee becomes disabled (within the meaning of Section 22(e)(3) of the Code) (unless the exercise period is extended by the Committee until a date not later than the expiration date of the Option) * * *

d.    Fourth Option

Petitioner was granted an option to purchase 35,000 shares of CTI common stock at $2.969 per share under the CTI 1994 Equity Incentive Plan Incentive Stock Option Agreement entered into as of December 10, 1998.  The agreement pertaining to this option contained the following recital:

Termination of Option.

A vested Option shall terminate, to the extent not previously exercised, upon the occurrence of one of the following events:

(i) ten (10) years from the date of grant; or December 10, 2008;

(ii) the expiration of three (3) months from the date of Optionee's termination of employment with the Company for any reason other than death or because Optionee becomes disabled (within the meaning of Section 22(e)(3) of the Code) (unless the exercise

period is extended by the Committee until a date not later than the expiration date of the Option) * * *

B. <u>Petitioner's Relationship With CTI After January 12, 2001</u>

    1. <u>Board of Directors' Resolution</u>

In or about the end of 2000, petitioner advised Dr. Bianco that she was going to terminate her employment with CTI because she was having a personality conflict with a key member of the staff. Dr. Bianco asked petitioner to remain affiliated with CTI for approximately 1 year longer to establish a transition plan for CTI. Petitioner agreed to do so, agreeing with CTI to enter into a consulting agreement under which she would work for CTI in a nonemployee capacity.

In connection therewith, CTI's Board of Directors' Compensation Committee adopted a resolution that stated that petitioner ceased to be employed by CTI as of January 12, 2001, that CTI continued to need petitioner's services, and that petitioner and CTI would enter into a consulting agreement to obtain petitioner's services.[2] The resolution resolved:

> cti shall enter into a consulting agreement with Ms. Moore which incorporates at a minimum the following terms and conditions:
>
> > For a period of one-year Ms. Moore may be called upon to perform Corporate Communications and Human Resource Development duties and responsibilities as determined by the CEO. It is expected Ms. Moore will

---

[2] The resolution does not state the date of its making.

devote approximately one-half the number of hours of a full-time equivalent.

As compensation for this agreement, Ms. Moore will receive:

a salary of $175,000

company-paid health and welfare benefits

As of January 12, 2001, the date of termination, Ms. Moore held 112,788 vested options and 35,000 unvested options to purchase cti Common Stock granted in accordance with the Corporation's 1994 Employee Stock Option Plan (the "1994 Plan"), which vested options would have been exercisable for a period of up to three months after the date of her termination with the Corporation, as provided in the 1994 Plan.

The Compensation Committee deems it appropriate and in the best interests of the Corporation to continue vesting of the unvested options according to the current vesting schedule and whereas the remaining unvested options would vest on December 10, 2000 and December 22, 2000, and extend the exercise period for vested and unvested options to 90 days after Ms. Moore completes this consulting arrangement.

2. <u>Consulting Agreement</u>

Petitioner and CTI entered into the referenced consulting agreement with an effective date of January 13, 2001, and a termination date of January 12, 2002 (unless terminated earlier or extended longer by agreement of the parties thereto). The agreement stated that petitioner would report to Dr. Bianco and would oversee and manage the corporate communications and human resource development departments; attend senior management team

meetings as mutually agreed upon by petitioner and Dr. Bianco; conduct staff meetings as needed for corporate communications and human resource development personnel; prepare the annual report for CTI, including coordinating the annual shareholder meeting and activities related thereto; manage and oversee CTI's Internet and Intranet websites; provide weekly contact with public relations groups in the industry; interview and hire additional staff for the corporate communications department; and perform additional services as agreed upon by petitioner and CTI. The agreement specified that "The parties hereto are acting as independent contractors. Consultant will be responsible for and will pay all taxes related to the receipt of payments hereunder and shall give reasonable proof and supporting documents, if reasonably requested, to verify the payment of such taxes."

The agreement stated that petitioner would be paid for her services at the rate of $175 per hour and that she would work no more than 1,000 hours during the 1-year term of the agreement unless she and CTI agreed otherwise. The agreement also stated that CTI would pay for petitioner's participation in health and dental plans for the term of the agreement; CTI paid for that participation under a plan that covered former employees. The agreement also stated that petitioner was entitled to receive reimbursement of her preapproved reasonable out-of-pocket business expenses (e.g., food, lodging, air and ground travel)

incurred in providing services to CTI.  Petitioner was required

to submit to CTI invoices for her hourly pay, and she was

required to submit with those invoices documentation supporting

her claim to reimbursement for out-of-pocket expenses.

The consulting agreement shortened the vesting period of

petitioner's stock options.  It stated:

> Options.  Consultant and CTI are parties to the
> 1997 Option Agreement ("Option Agreement") and the 1994
> CTI Equity Incentive Option Plan ("Option Plan") in
> which Consultant vests in CTI incentive stock options.
> In lieu of Consultant vesting in CTI incentive options
> according to the Option Agreement, the parties agree
> that Consultant shall vest in CTI incentive options for
> the term of this Agreement as provided hereunder and in
> the Option Plan.

| Option No. | Option Date | Type of Option | Shares | Price | Old Vest Date | New Vest Date |
|---|---|---|---|---|---|---|
| P000698 | 12/10/98 | ISO | 8,750 | 2.969 | 12/10/01 | 4/12/01 |
| P000698 | 12/10/98 | ISO | 2,916 | 2.969 | 12/10/01 | 7/12/01 |
| C000892 | 12/22/99 | ISO | 5,834 | 3.063 | 12/22/01 | 7/12/01 |
| C000892 | 12/22/99 | ISO | 5,833 | 3.063 | 12/22/01 | 10/12/01 |
| C000892 | 12/22/99 | ISO | 2,917 | 3.063 | 12/22/02 | 10/12/01 |
| C000892 | 12/22/99 | ISO | 8,749 | 3.063 | 12/22/02 | 1/12/02 |

> For avoidance of any doubt whatsoever, Consultant shall
> vest in each set of options provided this Agreement is
> in effect as of the vesting date for that respective
> set of options as described above (i.e. if Consultant
> terminates this Agreement on 8/12/01 she would be
> entitled to 17,500 vested options; she would not be
> entitled to the remaining 17,499 unvested options).
> Consultant would then have ninety (90) days from the
> date of termination of this Agreement to exercise the
> vested options.

Petitioner read the consulting agreement, thought she

understood it, signed it, and did not ask any questions regarding

it.  She believed that by entering into the agreement she would

work less.  She understood that she would be responsible for filing her own tax returns and paying her related taxes and that CTI would not pay or withhold any taxes for her benefit.  She knew her employment status with CTI was changing.  On or about May 24, 2001, petitioner informed CTI's section 401(k) plan that she had terminated her employment with CTI on January 12, 2001, and was electing to roll over her balance in that plan to her individual retirement account at CIBC Oppenheimer.

After January 12, 2001, petitioner was neither an officer, director, or 10-percent stockholder of CTI.  She continued to provide CTI with essentially the same types of services that she had provided to CTI before January 13, 2001, but she worked fewer hours after January 12, 2001, than she did before, and she was not paid a salary but was paid in accordance with the hours that she claimed on the invoices she submitted to CTI.  After January 12, 2001, petitioner continued to report to Dr. Bianco, but she was evaluated through verbal feedback and not as formally as before.  After January 12, 2001, she also could hire or subcontract third parties to perform most of the services listed in the consultation agreement, and she could have worked for companies other than CTI.  After August 2001, petitioner no longer headed or was responsible for CTI's human resource department.

CTI paid petitioner a bonus in 2001 for the work she had performed for CTI while employed by it in 2000. Petitioner did not receive a bonus in 2002 for the work she performed for CTI in 2001.

At or about the beginning of 2002, the parties to the consulting agreement agreed that the term of the agreement should be extended through March 3, 2002, so that petitioner could review the performance of CTI's employees. The consulting agreement was so extended, and it terminated on March 3, 2002.

C. Exercise of Stock Options

On March 5, 2002, petitioner exercised some of her options to buy CTI common stock. On that date, each of her purchased shares had a fair market value of $23.19. As to one option, petitioner paid an exercise price of $46,496 to purchase (at $2.906 per share) 16,000 shares of CTI common stock with a total fair market value of $371,040. Upon exercise of that option, she also paid $97,596.57 to CTI so CTI could withhold and pay Federal income, Social Security, and Medicare taxes associated with the exercise. As to another option, petitioner paid an exercise price of $58,120 to purchase (at $2.906 per share) 20,000 shares of CTI common stock with a total fair market value of $463,800. Upon exercise of that option, she also paid $115,415.96 to CTI so CTI could withhold and pay Federal income, Social Security, and Medicare taxes associated with the exercise. As to another

option, petitioner paid an exercise price of $9,467.75 to purchase (at $2.906 per share) 3,258 shares of CTI common stock with a total fair market value of $75,553.02. Upon exercise of that option, she also paid $18,801.26 to CTI so CTI could withhold and pay Federal income, Social Security, and Medicare taxes associated with the exercise. As to another option, petitioner paid an exercise price of $95,094.10 to purchase (at $2.969 per share) 32,029 shares of CTI common stock with a total fair market value of $742,752.51. Upon exercise of that option, she also paid $184,258.82 to CTI so CTI could withhold and pay Federal income, Social Security, and Medicare taxes associated with the exercise. As to another option, petitioner paid an exercise price of $107,205 to purchase (at $3.063 per share) 35,000 shares of CTI common stock with a total fair market value of $811,650. Upon exercise of that option, she also paid $200,414.60 to CTI so CTI could withhold and pay Federal income, Social Security, and Medicare taxes associated with the exercise.[3]

After exercising her options, petitioner had legal title to, was the beneficial owner of, had the right to receive dividends on, and had the right to vote her purchased stock. At no time

---

[3] In full, petitioner paid $316,382.85 to purchase 106,287 shares with a total fair market value of $2,464,795.53. Petitioner also paid CTI $616,487.21 with respect to the withholding taxes.

after exercising the options was she obligated to return any of that stock to CTI.  During 2002 and thereafter, petitioner did not sell any of the purchased shares.  Those shares were in electronic form.

D.    Petitioners' Agreement With CIBC Oppenheimer

Petitioners entered into a "Client Agreement" and an "Investment Management Agreement" with their stockbroker, CIBC Oppenheimer.  The client agreement stated:

> I agree to pay on demand any balance owing with respect to any of my accounts, including interest and commissions and any costs of collection (including attorneys fees, if incurred by you).  I understand that you may demand full payment of the balance due in my accounts plus any interest charges accrued thereon, at your sole option, at any time without cause and whether or not such demand is made for your protection.  In addition, Margin Loans are not made for any specific term or duration but rather are due and payable at your discretion upon demand * * *

The investment management agreement stated that "Client represents that Client is the beneficial owner of any securities Client may deliver to the Custodian and that there are no restrictions on the transfer, sale and/or public distribution thereof."  The investment management agreement also stated that "Client understands and agrees that all transactions shall be for Client's account and risk and that neither CIBC WM [CIBC World Markets Corp., the program manager of the assets of petitioners' account at CIBC Oppenheimer] nor any Portfolio Manager is guaranteeing, or otherwise making representations with respect

to, the performance of the Account and that CIBC WM shall not be liable for any losses in the Account".

E.  Payment of the Exercise Price and Withholding Taxes

CTI received payment in full for the exercise price and withholding taxes due upon petitioner's exercise of her options. Petitioner borrowed $932,870.06 from CIBC Oppenheimer to pay the total of the options' exercise price ($316,382.85) and CTI's withholding obligation ($616,487.21).  CIBC Oppenheimer wired the $932,870.06 ($316,382.85 + $616,487.21) to CTI, and CIBC Oppenheimer treated the wired funds as a borrowing that petitioner had made on her margin account at CIBC Oppenheimer. Petitioners were personally liable for the repayment of that borrowing and any interest that accrued with respect thereto.

On July 29, 2002, petitioner repaid the principal of the borrowing after she received margin calls from CIBC Oppenheimer. She obtained the funds for repayment by selling stocks and bonds, using available cash, borrowing money, and selling her house.  On July 29, 2002, the fair market value of petitioner's CTI stock (106,287 shares) was $3.175 per share or $337,461.23 in total.

F.  CTI's Insider Trading Policy and Trading Windows

According to CTI's Insider Trading Policy Statement:

An Insider or Temporary Insider is permitted to trade CTI stock only during certain specified periods (the "Trading Window") and only if the Insider or Temporary Insider is not at the time in possession of material, non-public information.  CTI's Trading Window will be opened only upon written notification from

CTI's Chief Financial Officer ("CFO"). In general, the Trading Window opens (i.e., trading is permissible) on the third business day after CTI releases information to the financial community about the prior quarter results, and closes (i.e., trading is prohibited) at the close of business on the fifteenth (15th) day of the last month of a fiscal quarter. If the fifteenth day of the month falls in a weekend, the window shall close on the last business day preceding the fifteenth day of the month.

The trading window was closed when petitioner exercised her options on March 5, 2002. The trading window remained closed until the third business day after May 13, 2002.

G. Petitioners' 2002 Federal Income Tax Return

Petitioner received from CTI a 2002 Form 1099 in the amount of $21,787.50. Petitioner also received from CTI a 2002 Form W-2, Wage and Tax Statement, that reported that petitioner had received $2,156,436.35 as wages, tips, or other compensation. The Form W-2 listed $582,066.18 as the amount of Federal income tax withheld. The wages reported by CTI on the Form W-2 included the spread between the strike prices and the fair market value of the stock received when petitioner exercised her stock options on March 5, 2002.

On or about April 15, 2003, petitioners filed their 2002 Federal income tax return. They reported the following relevant information on that return: $29,404 in wages, salaries, tips etc.; business income of $19,324 ($21,788 in gross receipts less $2,464 in expenses consisting of travel ($2,335) and meals and entertainment ($129)); total adjusted gross income of $80,730;

taxable income of $54,073; tax of $7,889; and Federal income tax withheld of $582,148. They claimed on that return that they were entitled to a refund of overpaid Federal income tax in the amount of $574,259 ($582,148 - $7,889).

Attached to the return was a Form 4852, Substitute for Form W-2, Wage and Tax Statement, or Form 1099-R, Distributions From Pensions, Annuities, Retirement or Profit-Sharing Plans, IRAs, Insurance Contracts, Etc., on which petitioners reported that CTI had paid petitioner $29,102.05 in wages or compensation. Also attached to petitioners' 2002 return were a "Form 4852 Calculation" prepared by The Issacson Law Firm and a "(Form 8275 Disclosure Statement) Memorandum of Law" prepared by petitioners' tax return preparer and counsel herein Brian Isaacson (Isaacson). The "Form 4852 Calculation" reported that petitioners had made a $2,127,334.31 negative adjustment to petitioner's wages as reported on the 2002 Form W-2 to calculate petitioner's wages as $29,102.05 ($2,156,436.35 - $2,127,334.31 = $29,102.04). The memorandum of law (memorandum of law) stated as facts that petitioner "was granted stock options as part of taxpayer's employment contract", that "taxpayer exercised employee stock options using margin debt secured by the stock exercised", and that "taxpayer has not risked taxpayer's own capital in the transaction". The memorandum of law concluded that "Under the facts and circumstances test in Section 1.83(a)(2) [sic], it

appears that the transfer to the taxpayer may be treated as similar to the grant of an option". This is so, the memorandum of law rationalizes (without any coherent explanation), because petitioner would not have to use her personal assets to pay the margin debt were her CTI stock to be insufficient to satisfy the debt in full. The memorandum of law stated that Isaacson was trying to get CTI to change the referenced 2002 Form W-2 to report the lower amount of wages but that "It is anticipated that Cell Therapeutics, Inc. will not correct the taxpayer's Form W-2 absent a ruling from the Internal Revenue Service".

OPINION

A.   Statutory Framework for Stock Options

Section 83(a) generally provides that when property is transferred to a person in connection with the performance of services, the fair market value of the property at the first time the rights of the person having the beneficial interest in the property are transferable or not subject to a substantial risk of forfeiture, less the amount paid for the property, is includable in the gross income of the person who performed the services. See Tanner v. Commissioner, 117 T.C. 237, 241 (2001), affd. 65 Fed. Appx. 508 (5th Cir. 2003); see also United States v. Tuff, 469 F.3d 1249, 1251-1252 (9th Cir. 2006). In general, an employee who receives a nonstatutory stock option without a readily ascertainable fair market value is taxed not on receipt

of the option but at the time, pursuant to the employee's exercise of the option, the shares have been transferred to, and become substantially vested in, the employee.  See sec. 83(a), (e)(3); <u>Tanner v. Commissioner</u>, <u>supra</u> at 242; sec. 1.83-1(a)(1), Income Tax Regs.  Shares become substantially vested in the employee when the shares are either transferable or not subject to a substantial risk of forfeiture.  See <u>United States v. Tuff</u>, <u>supra</u> at 1252; <u>Racine v. Commissioner</u>, T.C. Memo. 2006-162; <u>Facq v. Commissioner</u>, T.C. Memo. 2006-111; sec. 1.83-3(b), Income Tax Regs.

Section 83 does not apply to a "statutory" stock option; i.e., an "incentive stock option" (ISO) within the meaning of section 422(b), that meets the requirements of sections 421 through 424.  As relevant herein, section 421(a) provides that if the requirements of section 422(a) are met,[4] a taxpayer does not recognize income either upon the granting to the taxpayer of an ISO or when the taxpayer receives stock upon the ISO's exercise. Recognition of income is deferred until disposition of the stock. Sec. 421(a).  Section 422(b) defines an ISO as a stock option granted to an individual for any reason connected to his or her employment, if granted by a corporate employer (or its parent or

---

[4] Sec. 422(a) requires in relevant part that the option holder be an employee of the company granting the option at all times from the granting of the option until 3 months before the date of exercise.

subsidiary) to purchase the stock of the employer (or parent or subsidiary), but only if the requirements of section 422(b)(1) through (6) are met.

B.  Whether Petitioner's Stock Options Were ISOs

Petitioners argue that petitioner's stock options were ISOs. Respondent argues that petitioner's options were not ISOs in that they failed the requirements of section 422(b)(1) through (6).[5] Respondent argues alternatively that the options do not qualify for ISO treatment because petitioner was not an employee of CTI during the 3 months before their exercise, as required by section 422(a)(2).  We agree with respondent in both regards.

1.  Requirements of Section 422(b)

Section 422(b) generally sets forth six requirements that must be met for a stock option to qualify as an ISO.  First, the option must be granted pursuant to a plan.  Sec. 422(b)(1). Second, the option must be granted within 10 years from the date of the plan's adoption.  Sec. 422(b)(2).  Third, the option by

---

[5] Respondent argues primarily that the options failed the sec. 422(b) requirements upon their issuance.  Respondent also argues that petitioner's consulting agreement with CTI caused the options to be modified, see sec. 424(h)(1), and that the options as modified failed those requirements as well.  While petitioners assert in their reply brief that the issue of whether the options as originally granted were ISOs is a new issue improperly raised on brief, we disagree.  Among other things, we note that petitioners' petition (before amendment at trial) alleged that "The Commissioner erred by failing to determine that the stock options were classified as incentive stock options by Cell Therapeutics, Inc."

its terms may not be exercisable more than 10 years after the date the option is granted. Sec. 422(b)(3). Fourth, the option price must not be less than the fair market value of the stock at the time the option is granted. Sec. 422(b)(4). Fifth, the option by its terms may not be transferable except by will or laws of descent and distribution and must be exercisable during the optionee's lifetime only by the optionee. Sec. 422(b)(5). Sixth, when the option is granted, the optionee cannot own stock possessing more than 10 percent of the total combined voting power of all classes of stock of the employer (or its parent or subsidiary).

We agree with respondent that all of the section 422(b) requirements were not met as to the options as originally issued. To this end, we are unable to conclude that the options met the requirements of section 422(b)(1) through (4). We are unable to find on the basis of the credible evidence in the record that the options were issued pursuant to a specific plan, that CTI's shareholders approved such a plan, or the date on which a plan was adopted or approved. Nor are we able to find that the option price was at or above the fair market value of the related stock at the time of the options' issuance. We also note that the consulting agreement allowed petitioner to exercise her options within 90 days after the consulting agreement expired, a date that could have been more than 10 years after the grant date.

We also agree with respondent that the options as originally issued were later modified and that the options as modified also failed the requirements of section 422(b). Section 424(h)(1) provides that "if the terms of any option to purchase stock are modified, extended, or renewed, such modification, extension or renewal shall be considered as the granting of a new option." In this context, a "modification" denotes "any change in the terms of the option which gives the employee additional benefits under the option," except that the term does not include a change in the terms of an option "in the case of an option not immediately exercisable in full, to accelerate the time at which the option may be exercised." Sec. 424(h)(3).

The consulting agreement modified the original options and caused petitioner to receive a grant of new options pursuant to section 424(h). In this regard, the consulting agreement set new vesting dates for petitioner's options and gave her 90 days from the date of termination of the agreement to exercise the vested options. Petitioner benefited from this change in that she was given the right to exercise her options even if she ceased to be an employee of CTI for more than 90 days; under the original option agreements, the options would have expired 3 months or 90 days (depending upon the particular agreement) from the date of her termination of employment with CTI for any reason other than death or disability. Stated differently, as a result of the

modification, petitioner could still exercise her options if she ceased to be an employee of CTI for more than 90 days, as long as the consulting agreement had not been terminated for more than 90 days.

The options as modified failed the requirements of section 422(b). There is no plan in the record, and the option prices on the dates of grant were not shown to be equal to or greater than the fair market value of the CTI stock on those dates. The options also failed the requirement of section 422(b)(3) in that the options could be exercised up to 90 days after the termination of the consulting agreement, the term of which could have been extended by agreement of the parties. The effect of the modification was to give the options an indefinite term, so that each option was not limited "by its terms" as required by section 422(b)(3).

2. Requirement of Section 422(a)(2)

Respondent also argues that the options are not entitled to ISO treatment because petitioner was not an employee of CTI "at all times during the period beginning on the date of the granting of the option and ending on the day 3 months before the date" she exercised her options as required by section 422(a)(2). We agree. We apply the common law rules of employment to decide whether petitioner ceased to be an employee of CTI on December 5, 2001; i.e., 3 months before the exercise date of March 5, 2002.

See <u>Nationwide Mut. Ins. Co. v. Darden</u>, 503 U.S. 318, 323-325 (1992); <u>Weber v. Commissioner</u>, 103 T.C. 378, 386 (1994), affd. 60 F.3d 1104 (4th Cir. 1995); sec. 1.421-1(h), Income Tax Regs.; see also sec. 3401(c).  Our decision is a question of fact, see <u>Profl. & Executive Leasing, Inc. v. Commissioner</u>, 862 F.2d 751, 753 (9th Cir. 1988), affg. 89 T.C. 225 (1987); <u>Ellison v. Commissioner</u>, 55 T.C. 142 (1970), and we are guided by certain factors, none of which is dispositive in and of itself.  These factors are:  (1) The degree of control exercised by the principal over the details of the work, (2) the taxpayer's investment in the facilities used in the work, (3) the taxpayer's opportunity for profit or loss, (4) the permanency of the relationship between the parties to a working relationship, (5) the principal's right of discharge, (6) whether the work performed is an integral part of the principal's business, (7) what relationship the parties to a working relationship believe they are creating, and (8) the provision of employee benefits.  See <u>Nationwide Mut. Ins. Co. v. Darden</u>, <u>supra</u>; <u>NLRB v. United Ins. Co.</u>, 390 U.S. 254, 258 (1968); <u>Profl. & Executive Leasing, Inc. v. Commissioner</u>, <u>supra</u>; <u>Ewens & Miller, Inc. v. Commissioner</u>, 117 T.C. 263, 270 (2001); <u>Weber v. Commissioner</u>, <u>supra</u>.  We analyze these factors seriatim.

### a. Degree of Control

The "degree of control" or "right to control" test is the most important factor to consider in deciding the nature of a working relationship. Matthews v. Commissioner, 92 T.C. 351, 361 (1989), affd. 907 F.2d 1173 (D.C. Cir. 1990). Consideration is given not only to the control exercised by an alleged employer, but also to the degree to which the alleged employer may intervene to impose control. Radio City Music Hall Corp. v. Commissioner, 135 F.2d 715, 717 (2d Cir. 1943); Weber v. Commissioner, 103 T.C. at 387.

Before January 13, 2001, petitioner was a member of CTI's strategic management team, she was expected to work at the office full time, and she was required to be readily available to work for CTI. Beginning on January 13, 2001, as a result of the consulting agreement, petitioner was no longer required to work (nor did she work) as many hours as she did beforehand, she no longer had to be available to CTI at all times, and she was allowed to conduct her work for CTI at any location she pleased. In addition, in contrast with her work for CTI before January 13, 2001, petitioner afterwards did not receive written evaluations, she had the right to work for other companies, and she had the right to subcontract CTI business to third parties. Although petitioner's job was substantially similar to the one she did before she began working for CTI pursuant to the consulting

agreement, there were significant changes after the agreement that call into question the level of CTI's control over petitioner.  This factor favors a nonemployee relationship.

### b.  Investment in Facilities

After petitioner entered into the consulting agreement with CTI, she continued to use her CTI office.  She was able, had she wanted, to work anywhere she pleased after entering into the agreement.  This factor is neutral.

### c.  Opportunity for Profit or Loss

Beginning on January 13, 2001, petitioner had more flexibility and time to seek other employment.  She also was able to subcontract the consulting work she did for CTI; this provided her more time to seek other opportunities.  This factor favors a nonemployment relationship.

### d.  Permanency of the Relationship

The consulting agreement contemplated that petitioner would provide services to CTI for only one year, and it permitted the parties to the agreement to terminate it with 30 days' written notice.  After entering into the agreement, petitioner worked fewer hours than she had before and by August 2001 no longer had responsibility over CTI's human resource department.  This factor favors a nonemployee relationship.

e.  Principal's Right of Discharge

Petitioner's consulting agreement was nonexclusive, and either party could terminate the agreement with 30 days' written notice.  This factor favors a nonemployee relationship.

f.  Work as an Integral Part of Principal's Business

After petitioner entered into the consulting agreement, she was no longer as integral to CTI's business as she was beforehand.  She worked fewer hours for CTI, the agreement lasted only one year, she could pursue other consulting opportunities, and she gave up all responsibility for CTI's human resource department.  This factor favors a nonemployee relationship.

g.  Relationship of the Parties

Petitioner and CTI entered into a nonexclusive consulting agreement that stated specifically that petitioner was an independent contractor.  In addition, CTI calculated petitioner's income from her exercise of the stock options pursuant to section 83, as if she was not a CTI employee for the 3 months before the date of that exercise.  Further, petitioner notified CTI's section 401(k) plan that she had ceased working for CTI as an employee on January 12, 2001.  This factor favors a nonemployee relationship.

h.  Employee Benefits

During the period covered by the consulting agreement, CTI paid petitioner's health benefits pursuant to a plan for its

former employees.  Petitioner did not receive a bonus in 2002 for the work she performed in 2001.  Petitioner caused CTI's section 401(k) plan to distribute her account balance to her broker as a direct rollover into her individual retirement account.  This factor favors a nonemployee relationship.

### i.  Conclusion

The factors listed above support a finding that petitioner worked for CTI on and after December 5, 2001, as an independent contractor, and we make such a finding on the basis of the record at hand.  Accord Humphrey v. Commissioner, T.C. Memo. 2006-242. We conclude that petitioner's stock options, even if they were otherwise ISOs within the meaning of section 422(b), did not qualify under section 422(a)(2) for ISO treatment.

### C.  Whether Petitioner Received Income on Exercise of Options

We decide whether petitioner received income when she exercised her options in 2002.  Petitioners rely upon section 1.83-3(a)(2), Income Tax Regs., and argue that no transfer occurred upon petitioner's exercise of her options because, they state, she paid for the exercise using nonrecourse debt. According to petitioners, petitioner did not place any of her own capital at risk until July 29, 2002, when she used petitioners' resources to pay her borrowing from CIBC.  We disagree with this argument, which is the same argument that the Court of Appeals for the Ninth Circuit recently considered and labeled

"nonsense".[6]  United States v. Tuff, 469 F.3d at 1253.  As was true in the case of the taxpayer there, petitioner exercised her options and purchased her CTI stock with cash.  While the cash may not have come directly from her assets, but was borrowed from CIBC Oppenheimer, she was personally liable to CIBC for repayment of that borrowing.  We also note that she owned her CTI stock after the exercise and had all of the rights of ownership related thereto.

Apparently seeing the illogic of their just-rejected argument, petitioners in their petition and in their briefs expand their position as set forth in the memorandum of law by arguing that the shares obtained through the exercise of the stock options were subject to a substantial risk of forfeiture or were nontransferable due to CTI's insider trading policy.  Most specifically, petitioners argue, petitioner exercised her options during the corporate blackout period; thus, they conclude, the shares were subject to a substantial risk of forfeiture and were nontransferable until May 17, 2002, the day the restricted windows under the corporate insider trading policy ended.  We disagree with this argument.

_____

[6] This argument has been previously considered and rejected by this Court and others.  See Facq v. Commissioner, T.C. Memo. 2006-111; Hilen v. Commissioner, T.C. Memo. 2005-226; see also Palahnuk v. United States, 70 Fed. Cl. 87 (2006), affd. 475 F.3d 1380 (Fed. Cir. 2007); Facq v. United States, 363 F. Supp. 2d 1288 (W.D. Wash. 2005); Miller v. United States, 345 F. Supp. 2d 1046 (N.D. Cal. 2004), affd. 209 Fed. Appx. 690 (9th Cir. 2006).

As was true in the case of petitioners' previous argument, this argument was considered and rejected by the Court of Appeals for the Ninth Circuit in United States v. Tuff, supra at 1255-1257.  We do likewise here.  A taxpayer's rights in property generally are subject to a substantial risk of forfeiture if the taxpayer's rights to full enjoyment of the property are conditioned upon the future performance (or refraining from performance) of substantial services, sec. 1.83-3(c)(1), Income Tax Regs.; a taxpayer's rights in property are transferable only if the rights in such property of any transferee are not subject to a substantial risk of forfeiture, sec. 83(c)(2).  Petitioners make no claim that petitioner's rights to retain her CTI stock were conditioned upon the future performance (or nonperformance) of any services or the occurrence of any condition related to a purpose of the transfer.  In fact, petitioner's consulting agreement had terminated when she exercised the options, so her rights to retain the shares were not conditioned on the future performance or nonperformance of services.  Nor do petitioners argue that petitioner was subject to any risk, substantial or otherwise, that she would have to return the stock to CTI at any time after she exercised her options on March 5, 2002.  To the contrary, petitioners stipulated that at no time after exercising her CTI stock options was petitioner under any obligation to return the stock to CTI and that during 2002 and thereafter,

petitioner did not sell any shares of CTI she obtained through the March 5, 2002, exercise of stock options. See Merlo v. Commissioner, T.C. Memo. 2005-178. While petitioner might have violated CTI's insider trading policy had she sold her CTI stock to a third party upon receiving it, the possibility of such a violation does not create a substantial risk of forfeiture within the meaning of section 83. See United States v. Tuff, supra at 1255-1256.

D. Accuracy-Related Penalty

Respondent determined that petitioners are liable for an accuracy-related penalty under section 6662(a) and (b)(2) for a substantial understatement of income tax. In part, section 6662(a) and (b)(2) imposes a 20-percent accuracy-related penalty for any portion of an underpayment that is attributable to a substantial understatement of income tax. An "understatement" is the excess of the amount of tax required to be shown on the return for the taxable year over the amount of tax imposed that is shown on the return, reduced by any rebate. Sec. 6662(d)(2). A substantial understatement of income tax exists for any taxable year for purposes of section 6662 if the amount of the understatement for the taxable year exceeds the greater of 10 percent of the tax required to be shown on the return for the taxable year or, in the case of an individual, $5,000. Sec. 6662(d)(1)(A).

Respondent concedes that he bears the burden of production under section 7491(c) and must come forward with sufficient evidence indicating that it is appropriate to impose an accuracy-related penalty on account of a substantial understatement of income tax. See Higbee v. Commissioner, 116 T.C. 438, 446-447 (2001). In that we discern from the record that petitioners' understatement is in excess of $5,000, and of 10 percent of the amount required to be shown on the return, we conclude that respondent has met this burden of production. Petitioners bear the burden of proving that the accuracy-related penalty does not apply because of reasonable cause, substantial authority, or the like. Id.

In an attempt to meet their burden of proof, petitioners argue in brief that they are not liable for the accuracy-related penalty because they acted reasonably and in good faith by relying on their tax adviser to prepare their 2002 Federal income tax return correctly. Petitioners also try to prove that they acted reasonably and in good faith by noting that the taxpayer in Facq v. Commissioner, T.C. Memo. 2006-111, was in a similar setting. There, the Court declined to sustain respondent's determination of an accuracy-related penalty for (among other reasons) substantial understatement of income tax, stating that

the issue was novel as of the time that the taxpayers filed their tax return for the year at issue there.[7]

We agree with petitioners that they are not liable for the accuracy-related penalty at issue. Such an accuracy-related penalty is not imposed upon any portion of an underpayment as to which a taxpayer acted with reasonable cause and in good faith. Sec. 6664(c)(1). Whether the taxpayer satisfies those tests is a factual determination, where the taxpayer's effort to assess the taxpayer's proper tax liability is a very important consideration. Sec. 1.6664-4(b)(1), Income Tax Regs. Reliance on the advice of a tax professional may constitute reasonable cause and good faith if, under all facts and circumstances, the reliance is reasonable and the taxpayer acted in good faith. See Neonatology Associates, P.A. v. Commissioner, 115 T.C. 43, 98

---

[7] Petitioners also argue at length that respondent's determination of the accuracy-related penalty is "null and void". This is so, petitioners assert, because the notice of deficiency neither shows specifically that respondent considered the reasonable cause exception of sec. 6664, nor explains why that exception was determined not to be applicable to this case. As petitioners see it, such a showing and explanation in the notice of deficiency is required by the Omnibus Budget Reconciliation Act of 1989 (OBRA), Pub. L. 101-239, 103 Stat. 2106, as discerned from the legislative history thereunder (specifically, H. Rept. 101-247, at 1393 (1989)). We disagree with this argument. We read nothing in OBRA that requires that the inclusion of an accuracy-related penalty in a notice of deficiency, to be valid, must be accompanied by a specific showing that respondent considered the reasonable cause exception of sec. 6664 and an explanation as to why that exception was determined to be inapplicable. See also Facq v. Commissioner, T.C. Memo. 2006-111.

(2000), affd. 299 F.3d 221 (3d Cir. 2002); sec. 1.6664-4(c)(1), Income Tax Regs.; see also Catalano v. Commissioner, 240 F.3d 842, 845 (9th Cir. 2001), affg. T.C. Memo. 1998-447. Reasonable cause and good faith also may be found where a position taken on a return involves an issue that is novel as of the time that the return was filed. See Williams v. Commissioner, 123 T.C. 144, 153-154 (2004); Mitchell v. Commissioner, T.C. Memo. 2000-145; cf. Van Camp & Bennion v. United States, 251 F.3d 862, 868 (9th Cir. 2001) ("Where a case is one 'of first impression with no clear authority to guide the decision makers as to the major and complex issues,' a negligence penalty is inappropriate" (quoting Foster v. Commissioner, 756 F.2d 1430, 1439 (9th Cir. 1985), affg. in part and vacating as to an addition to tax for negligence 80 T.C. 34 (1983))).

We find reasonable cause on the basis of the fact that the issue at hand was novel at the time petitioners filed their tax return. To be sure, while the Court of Appeals for the Ninth Circuit in United States v. Tuff, 469 F.3d at 1253, rejected the taxpayer's margin debt argument as "nonsense", the court stated that the issue was "A question of first impression in this circuit", id. at 1251. Given this statement, and the absence when petitioners filed their 2002 Federal income tax return of any "clear authority to guide the decision makers as to the major and complex issues", Foster v. Commissioner, supra at 1439, we

decline to sustain respondent's determination that petitioners are liable for an accuracy-related penalty for substantial understatement of income tax. Accord <u>Montgomery v. Commissioner</u>, 127 T.C. 43, 67 (2002); <u>Racine v. Commissioner</u>, T.C. Memo. 2006-162; <u>Facq v. Commissioner</u>, T.C. Memo. 2006-111.

E. <u>Holdings</u>

We hold that petitioner realized income in 2002 when she exercised her stock options received from CTI. We also hold that petitioners are not liable for the accuracy-related penalty determined by respondent under section 6662(a) and (b)(2). We have considered all arguments made by petitioners for a contrary holding as to the deficiency, and we have considered all arguments made by respondent for a contrary holding as to the accuracy-related penalty. As to the arguments that we have considered but not discussed herein, we have rejected those arguments as without merit.

<u>Decision will be entered for respondent as to the deficiency; decision will be entered for petitioners as to the accuracy-related penalty</u>.