# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 06-4103

ROBERT C. RACINE and GAIL K. RACINE,

*Petitioners-Appellants*,

*v.*

COMMISSIONER OF INTERNAL REVENUE,

*Respondent-Appellee*.

Appeal from the United States Tax Court.
No. 17633-04—**Joseph R. Goeke**, *Judge*.

ARGUED MAY 23, 2007—DECIDED JULY 3, 2007

Before EASTERBROOK, *Chief Judge*, and BAUER and MANION, *Circuit Judges*.

EASTERBROOK, *Chief Judge*. Non-cash compensation, such as shares of stock, is taxable when the "transfer" to the recipient occurs. 26 U.S.C. §83. According to a Treasury Regulation, 26 C.F.R. §1.83-3(a)(2), the grant of an option to purchase stock (or other property) is not itself a transfer, which does not occur until the option is exercised. This case presents the question whether the "transfer" may be postponed even after the option's exercise, on the theory that borrowing to finance the transaction amounts to a second option that replaces the first.

Gail Racine held options to purchase stock of Allegiance Telecom, Inc., her employer. (Allegiance has since been acquired by XO Communications, Inc.; we use names from the time of the events.) Racine's options were not qualified for tax deferral under 26 U.S.C. §§ 421-22; as a result, any gain on exercise (the difference between the exercise price and the market price) was taxable at ordinary-income rates as soon as a "transfer" occurred. Because the full gain is subject to tax, the owner's basis in the stock is equal to the market price at the time of transfer. Usually a high basis at the outset means lower taxes later; things did not work out that way for Racine, however. (Gail Racine filed a joint return with her husband Robert; for simplicity we refer to Gail Racine as the taxpayer.)

From March through July 2000 Racine exercised options to purchase 25,257 shares of Allegiance Telecom's stock. The exercise price was $58,810.79, and the market value of the shares at the time of exercise was $1,972,705.63 (an average of $78.10 per share). Allegiance Telecom remitted about $625,000 in income tax on Racine's gain of about $1.9 million and demanded reimbursement for the withholding tax before it would give Racine clear title to the shares. To finance the exercise price and the tax, she borrowed about $684,000 on margin from CIBC Oppenheimer, a market-maker in Allegiance Telecom. Unfortunately for Racine, the market price of Allegiance Telecom's stock began to decline soon after she exercised the options, and CIBC Oppenheimer issued margin calls in order to ensure that the stock was worth at least 1.35 times the outstanding debt. (That minimum ratio is required by the Federal Reserve Board's Regulation T.) In November 2000 Racine sold 18,921 shares at an average price of $15.61 per share, and in May 2001 she sold 1,836 shares at $20.41 per share. That left her with 4,500 shares of stock and a burning desire to reduce her tax

liability—because by May 2001 her gains had shrunk to about $366,000,[†] on which roughly $625,000 in income tax had been withheld. No one likes to pay a 170% tax.

Racine had suffered a capital loss, but (with insignificant exceptions) capital losses may be offset only against capital gains, of which Racine had none, because the gain from the options' exercise was ordinary income, and her basis in these shares was $1.97 million. If the options had been tax-qualified, then the basis would have been lower and the sale of the shares would have produced, not a huge capital loss, but a modest capital gain or loss.

Racine's solution to her problem was to claim a $368,000 refund (plus interest) on her 2000 tax return. The idea was that the shares had not been "transferred" to Racine during the first half of 2000, when they traded for more than $78 apiece. Instead, the return asserted, the transfer occurred in November 2000 when they were sold—and the shares held into 2001 were not transferred, and thus were not subject to tax, until they too were sold. The refund request was honored, but after an audit the Internal Revenue Service demanded the money back. The Tax Court held that the refund had been erroneous and that Racine must pay $514,000 in back taxes and interest; the Commissioner's request for a penalty, however, was rejected. T.C. Memo 2006-162, 2006 Tax Ct. Memo LEXIS 164 (Aug. 14, 2006). The Tax Court held that a transfer occurred when the options were exercised because Racine acquired full legal and beneficial ownership of the shares: she could sell them outright (ditching all firm-specific risk in the volatile telecommunications industry),

---

[†] Racine paid $58,811 for the shares. The sales in November 2000 and May 2001 realized a total of $332,881, and the 4,500 shares she still held had a market price of roughly $92,000. Her net profit (disregarding any interest paid on the margin loan) thus was roughly $366,000.

vote them, hypothecate them, and so on. This satisfies the regulation's definition of a "transfer." 26 C.F.R. §1.83-3(a)(1) ("a transfer of property occurs when a person acquires a beneficial ownership interest in such property").

Racine's theory is that a "transfer" occurs only when a taxpayer puts "her own" money into a transaction. This argument is based on two subsections and one example from Treas. Reg. §1.83-3(a), which for easy reference we reproduce below:

> (2) Option. The grant of an option to purchase certain property does not constitute a transfer of such property. . . . In addition, if the amount paid for the transfer of property is an indebtedness secured by the transferred property, on which there is no personal liability to pay all or a substantial part of such indebtedness, such transaction may be in substance the same as the grant of an option. The determination of the substance of the transaction shall be based upon all the facts and circumstances. The factors to be taken into account include the type of property involved, the extent to which the risk that the property will decline in value has been transferred, and the likelihood that the purchase price will, in fact, be paid. . . .
>
> . . .
>
> (6) Risk of loss. An indication that no transfer has occurred is the extent to which the transferee does not incur the risk of a beneficial owner that the value of the property at the time of transfer will decline substantially. Therefore, for purposes of this (6), risk of decline in property value is not limited to the risk that any amount paid for the property may be lost.
>
> . . .

> Example (2). On November 17, 1972, W sells to E 100 shares of stock in W corporation with a fair market value of $10,000 in exchange for a $10,000 note without personal liability. The note requires E to make yearly payments of $2,000 commencing in 1973. E collects the dividends, votes the stock and pays the interest on the note. However, he makes no payments toward the face amount of the note. Because E has no personal liability on the note, and since E is making no payments towards the face amount of the note, the likelihood of E paying the full purchase price is in substantial doubt. As a result E has not incurred the risks of a beneficial owner that the value of the stock will decline. Therefore, no transfer of the stock has occurred on November 17, 1972, but an option to purchase the stock has been granted to E.

Buying stock with borrowed money, the theory goes, is like replacing one option with another: as long as a broker (or any third party) supplies the capital, the taxpayer has nothing at risk and can walk away freely, allowing the broker to sell the collateral in the market to cover the loan. The non-recourse nature of the debt (subsection 2), combined with the fact that none of the taxpayer's capital is at risk (subsection 6), makes Racine's transaction look like example (2), in which a non-recourse loan works like an option by allowing E to capture any gain in the stock's value without taking a risk of loss.

This line of argument has been made to the Tax Court, which has consistently rejected it (the decision in Racine's case is one of many) and to three other circuits, all of which have held against the taxpayer. See *Palahnuk v. United States*, 475 F.3d 1380 (Fed. Cir. 2007); *Cidale v. United States*, 475 F.3d 685 (5th Cir. 2007); *United States v. Tuff*, 469 F.3d 1249 (9th Cir. 2006). No court at any

level has ruled against the Commissioner on this subject. We agree with *Palahnuk*, *Cidale*, and *Tuff*, making the score 4-0 among appellate tribunals.

The keystone of Racine's position is the contention that she had nothing at risk, because if the price declined the broker would liquidate the stock and recover the balance on the loan. This fundamentally misunderstands financial risk. Racine proceeds as if "risk" means only risk to one's *other* assets, such as her home or retirement account. That's not the sort of risk to which Example (2) refers, however: the Example asks whether the investor bears a risk that *this* asset's price will decline. Racine bore that risk. In the first half of 2000 she owned stock trading for about $2 million. She could have sold it and bought artworks, a new house, or an index fund that held the Standard & Poor's 500 portfolio and would track the stock market as a whole. Instead she chose to remain undiversified, keeping a risky asset in the hope that its price would rise. She ventured $2 million and lost most of it. (The rule limiting business-expense deductions to amounts at risk, see 26 U.S.C. §465, which Racine discusses at length, has nothing to do with her situation. Section 465 does not define a "transfer" for the purpose of §83.)

The holder of a call option can gain but not lose, for if the price declines the holder simply walks away from the option. That's the position person E (from Example 2) was in, which is why it made sense to call E's status that of an option-holder even though E was the legal owner of the shares. But Racine did not have the luxury of walking away from a decline in the stock's price and being no worse off. (A call option's owner could lose if the option is traded, for the option's price declines with the value of the underlying asset, but this qualification does not matter to the definition of a "transfer," which deals with non-traded options. An option's owner also faces a loss in

opportunity-cost terms, but the Internal Revenue Code does not tax opportunity costs and foregone gains. This is why we treat an "option" as a device insulating the owner from loss.)

Racine also is mistaken to call her margin loan "non-recourse debt." Her contract with CIBC Oppenheimer was explicit: Racine was personally liable for the full amount. "Non-recourse debt" describes an arrangement in which (as in Example 2) the lender agrees to look *exclusively* to the collateral, and never to dun the borrower for a deficiency if a sale of the collateral fetches less than the balance. CIBC Oppenheimer did not agree to collect its loan exclusively by selling shares; such a promise would have been illegal under Regulation T. Suppose the market in Allegiance Telecom stock had become illiquid so that CIBC Oppenheimer could not sell Racine's stock, or had plunged so fast that in a single day the market value of Racine's stock fell below the balance on the loan; in either situation Racine would have had to make up any shortfall. There is a big legal difference between *secured debt* and *non-recourse debt*. A bank that lends $100,000 against a house appraised for $1 million is well secured, but unless the bank had agreed not to collect from the house's owner the loan is with recourse. If the house burns down, and its value falls to $50,000, the owner must chip in the difference. Just so with Racine's margin loan. She had personal liability on the indebtedness, so subsection (2) does not help her, and she took a risk of loss (which came to pass), so subsection (6) does not help her either.

At oral argument, Racine's lawyer asked us to treat CIBC Oppenheimer as if it were the issuer, on the ground that a broker-dealer that finances employees' exercise of stock options helps the corporation get the tax deduction (which depends on the option being exercised and the gain treated as deductable wage compensa-

tion). The "as if" condition may have been possible in 2000, though after the Sarbanes-Oxley Act the issuer itself can't make loans to its executives. Still, nothing in §1.83-3 turns on who makes a loan; the regulation directs attention to the financial risk that the taxpayer bears. At all events, the as-if argument would be a poor legal fiction; CIBC Oppenheimer was an independent broker-dealer, not an affiliate of Allegiance Telecom. The risk that Racine took, and her legal obligation to repay, was no different because CIBC Oppenheimer was a market maker than it would have been if she had borrowed from any other broker-dealer.

A transfer occurs when a taxpayer exercises an option and acquires full legal and beneficial ownership of stock—for the owner is subject to market risk from that time on. If Racine wanted to reduce her exposure, she could have hedged with put options, or sold the stock and invested in a diversified portfolio, or withdrawn the money from the stock market altogether. That she decided to keep the money in Allegiance Telecom does not alter the fact that she owned the stock itself, rather than a call option on stock.

AFFIRMED

A true Copy:

Teste:

_____
*Clerk of the United States Court of
Appeals for the Seventh Circuit*