T.C. Memo. 2012-69

UNITED STATES TAX COURT

PATRICK J. SHEEDY AND KAREN J. SHEEDY, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 20101-09.                       Filed March 14, 2012.

<u>Jonathan P. Decatorsmith</u>, for petitioners.

<u>Mayer Y. Silber</u> and <u>David S. Weiner</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

LARO, <u>Judge</u>:  Petitioners Patrick J. Sheedy and Karen J. Sheedy petitioned

the Court to redetermine deficiencies respondent determined in their 2005 through

2007 Federal income taxes of $9,036, $47,106, and $5,409, respectively, and section 6662(a) accuracy-related penalties of $1,807, $9,421, and $1,082, respectively.[1] Following concessions,[2] we decide whether petitioners are due a refund of Federal income tax paid in connection with Mr. Sheedy's exercise of employee nonstatutory stock options. We hold they are not.

FINDINGS OF FACT

The parties filed with the Court a stipulation of facts and accompanying exhibits. We find the stipulated facts accordingly. Petitioners resided in Illinois when they petitioned the Court.

---

[1]Unless otherwise indicated, section references are to the applicable version of the Internal Revenue Code (Code), and Rule references are to the Tax Court Rules of Practice and Procedure. Some dollar amounts are rounded.

[2]The parties agree that petitioners: (1) Received interest income of $588 in 2005; (2) are entitled to mortgage interest deductions of $44,765, $95,023, and $51,982 in 2005 through 2007, respectively; (3) are entitled to deductions for real estate taxes paid of $13,474 and $16,383 in 2005 and 2006, respectively; and (4) are entitled to charitable contribution deductions of $1,149 and $4,091 in 2005 and 2006, respectively. Petitioners concede that they are liable for accuracy-related penalties under sec. 6662(a) on portions of the deficiencies relating to the disallowed charitable contribution deductions for 2005 and 2006, and respondent concedes that petitioners are not liable for accuracy-related penalties under sec. 6662(a) on the remaining portions of the deficiencies.

I.     Petitioner

Patrick J. Sheedy (petitioner) graduated from the University of Wisconsin at

Oshkosh in 1980 with a bachelor of science degree in history.  Over the past 30

years, he has held numerous positions of varying responsibility within the lending

industry, including but not limited to executive, manager, mortgage underwriter,

credit supervisor, and loan officer.  He has received on-the-job training in consumer

lending, mortgage lending, bank financial products, and mortgage-backed securities.

II.    PCFC and PCHLI

People's Choice Home Loan, Inc. (PCHLI), was formed in 1999 by Neil

Kornswiet and began originating loans in 2000.  People's Choice Financial Corp.

(PCFC) and People's Choice Funding, Inc. (Funding), were each formed in May

2004, with Funding being a wholly owned subsidiary of PCFC.  Pursuant to a

restructuring on December 28, 2004,[3] PCFC  became the parent corporation of

PCHLI and Funding ostensibly to qualify as a real estate investment trust (REIT)

---

[3]As part of the restructuring, PCFC conducted a common stock offering in
which it sold 35,318,410 shares of common stock at $10 per share.  After an initial
purchaser's discount, fees and expenses, the offering yielded to PCFC net proceeds
of $325.2 million.  Under the restructuring, PCHLI's outstanding shares of
convertible preferred stock were redeemed for $3.5 million and each share of
PCHLI common stock was exchanged for 271.067 shares of PCFC common stock
plus a pro rata share of a dividend totaling $15.2 million.

for Federal income tax purposes. After the restructuring, PCFC was for the most part a holding company with few assets or liabilities apart from its subsidiary interests.

PCFC operated as a REIT from May 2004 until at least March 2007, when it filed a petition for chapter 11 bankruptcy in the U.S. Bankruptcy Court for the Central District for California (bankruptcy court). Throughout that time, PCFC originated, sold, securitized, and serviced residential nonprime loans through its wholly owned REIT subsidiaries, PCHLI and Funding. The majority of those operations, however, were conducted through PCHLI.

III.     Petitioner's Employment With PCHLI

PCHLI employed petitioner from October 2001 through June 2006; first as its chief credit officer, then as its chief operating officer, and lastly as a regional sales manager. For his services, he earned a base salary of between approximately $150,000 and $413,000 per year; the former for work as an executive and the latter for that of a manager. Additionally, PCHLI granted petitioner an option on PCFC stock together with other compensation such as a one-time "loyalty" payment.

IV.     Grant of Options to Petitioner

In connection with the restructuring, on December 28, 2004, PCFC granted to petitioner the option to purchase 271,067.30 shares of PCFC common stock at

$0.0221347 per share.[4] The options, which the parties stipulated are nonstatutory stock options, expired three months following petitioner's termination with PCHLI. The stock option grant was made under the PCFC 2004 Stock Incentive Plan (incentive agreement).

The incentive agreement defined the fair market value of a share of PCFC common stock to mean, on any given date, the fair market value of a share of PCFC common stock as determined by the compensation committee of the board of directors (committee). The incentive agreement specified that the committee's determination of fair market value was final, binding, and conclusive on PCFC, its affiliates, and each participant. As relevant here, the incentive agreement required only that the committee determine the fair market value of PCFC stock without regard to any nonlapse restrictions.

V.    Petitioner's Exercise of the Options

After departing from PCHLI in June 2006, petitioner exercised most of his options on September 22, 2006 (exercise date), purchasing 250,000 shares of PCFC stock. In connection with his exercise of the options, petitioner represented to PCFC that he was an "accredited investor" as that term is defined in rule 501 of

---

[4]PCHLI had granted to petitioner an option to acquire its stock (canceled options) which petitioner did not exercise. The canceled options were exchanged for an option on PCFC stock as part of the restructuring of PCFC and PCHLI.

regulation D under the Securities Act of 1933 (1933 Act), that he was aware of PCFC's business affairs and financial condition, and that he had acquired sufficient information about PCFC to reach an "informed and knowledgeable decision" to acquire the PCFC stock. Petitioner also acknowledged that he understood that the PCFC stock constituted "restricted securities" under the 1933 Act. Finally, petitioner expressed familiarity with the provisions of Securities and Exchange Commission (SEC) rule 144 under the 1933 Act; specifically, that he understood that public resale of the PCFC stock was generally not allowed until after a holding period of at least one year.

In addition to executing these representations, petitioner paid to PCFC a total of $225,277.38, consisting of the $5,533.75 options purchase price (250,000 shares times $0.0221347 exercise price)[5] and withholding tax of $219,743.63. PCFC determined that the value of its stock on the exercise date was $3 per share and that the stock award was worth $744,466 (250,000 shares times $3 per share minus the $5,534 purchase price).

VI.  PCFC's IPO Consideration

On or before May 18, 2005, PCFC contemplated an initial public offering (IPO) of its stock. In anticipation thereof, PCFC filed with the SEC a Form S-11

---

[5]We note that 250,000 times $0.221347 is $5,533.675, and not $5,533.75.

registration statement in June 2006,[6] the same month petitioner terminated his employment with PCHLI. The record does not include a copy of the Form S-11, but a corporate resolution adopted on May 18, 2005, authorized PCFC's designated officers to file that registration statement with the SEC for an IPO of PCFC stock with a primary offering price of up to $400 million, inclusive of an underwriters' over-allotment option of 15%. PCFC ultimately did not go public.

VII. Trading of PCFC Stock

A. FBR

FBR Capital Markets, Inc. (FBR), formerly Friedman, Billings, Ramsey & Co., Inc., is an investment adviser offering investment banking, sales, and trading services. FBR's relationship with PCFC goes at least as far back as its role in serving as the lead underwriter in connection with the 2004 restructuring. As of 2007 FBR was a registered broker-dealer that was a member of the National Association of Securities Dealers (NASD) and NASDAQ. Also during 2007, FBR was a NASDAQ market maker for nearly 900 stocks and its research department covered approximately 625 companies. From January 2001 through at least May

---

[6]Form S-11 is filed pursuant to the 1933 Act for registration of (a) securities issued by REITs, or (b) securities issued by other issuers whose primary business is that of acquiring and holding for investment real estate or interests in real estate or interests in other similarly-situated issuers. See 17 C.F.R. sec. 239.18 (2012).

2007, FBR was the leading bookrunner (i.e., the market leader) for private resale of securities to institutions under SEC rule 144A under the 1933 Act. As a market maker in 2007, FBR operated a bid-ask spread in which it matched buyers and sellers in the purchase and sale of stock in over-the-counter markets. FBR recorded each transaction in a proprietary software platform, and the parties have stipulated 39 transactions of PCFC stock traded through FBR.

B.     PCFC Trading Activity

PCFC shares were not publicly traded but bought and sold mostly, if not entirely, through FBR. FBR maintained a trading desk with the ability to facilitate secondary trading among and between accredited investors and qualified institutional buyers. FBR did not set these prices but reported prices resulting from a bid-ask process in which it acted as the market maker.

Between January 11, 2005, and February 22, 2007, FBR traded PCFC stock on each of 39 days. The price per share ranged between $1.50 and $10.25, and the volume of shares traded ranged between 470 and 3,351,600 shares. PCFC stock was last traded at $1.50 per share on February 22, 2007, and has not traded since then. As relevant here, FBR placed the following PCFC shares into the market during 2006 and 2007:

| Trade Date | Price | Volume |
|---|---|---|
| June 30, 2006 | 3.00 | 3,351,600 |
| July 13, 2006 | 3.00 | 1,200 |
| Aug. 10, 2006 | 3.00 | 3,600 |
| Sept. 21, 2006 | 3.00 | 6,900 |
| Oct. 16, 2006 | 3.00 | 254,800 |
| Dec. 18, 2006 | 2.00 | 212,000 |
| Jan. 31, 2007 | 1.50 | 100,600 |
| Feb. 22, 2007 | 1.50 | 144,400 |

C.      Petitioner's Attempts to Sell the PCFC Stock

From late October through December 2006, petitioner repeatedly tried to sell his PCFC stock through FBR without success. Indeed, he owned the PCFC stock at the time of trial. Petitioner was not alone in his inability to sell the PCFC stock; a fellow manager also experienced difficulty selling approximately 117,000 shares around the same time.

VIII. PCFC's Financial Deterioration

PCFC's financial condition deteriorated significantly between 2004 and 2006. The company was depleting cash. Its cash and cash equivalents decreased from $365.06 million to $16.679 million between yearend 2004 and yearend 2006. The company's future growth prospects were limited. Its yearend 2004 retained earnings of more than $60.7 million had transformed into an accumulated deficit of more than $232.6 million by yearend 2006. At yearend 2006, its assets of

approximately $4.588 billion marginally exceeded its liabilities of approximately $4.479 billion. The liabilities likewise showed minimal potential for turnaround. For example, between yearend 2004 and yearend 2006 its liabilities for mortgage-backed securities ballooned from less than $1.2 billion to more than $3.3 billion. Finally, PCFC's consolidated financial statements for yearend 2005 indicated a per share book value of approximately $5.62 ($334.108 million total equity divided by 59,490,491 shares outstanding), but its consolidated financial statements for yearend 2006 indicated a per share book value of approximately $1.81 ($109.355 million total equity divided by 60,294,560 shares outstanding). In the end, PCFC's financial troubles were too great to overcome, and it declared bankruptcy in March 2007.

IX.    Issuance of Form W-2

PCHLI issued to petitioner for 2006 a Form W-2, Wage and Tax Statement, reporting wages, tips, and other compensation of $830,630 and Federal income tax withheld of $199,994. Reported in box 12 of the Form W-2 was code V, indicating that petitioner received income from the exercise of nonstatutory stock options of $744,466.25 ($750,000 stock award less $5,533.75 options price). According to the 2006 Instructions for Form W-2, amounts in box 12 accompanied by code V report the spread from the employee's exercise of the nonstatutory stock options

(i.e., the difference between the fair market value of the stock and the exercise price of the options).

## X. Federal Income Tax Returns

Petitioners filed a 2006 joint Federal income tax return (original return) on which they reported income from the exercise of the options as taxable income. They later filed an amended 2006 joint Federal income tax return claiming a theft loss of $744,466.25 with respect to the PCFC stock. After subtracting the $100 limitation imposed by section 165(h)(1) and applying the adjusted gross income limitation under section 165(h)(2) petitioners calculated their theft loss for Federal income tax purposes as $643,263.36,[7] and they claimed that amount as an increased itemized deduction for 2006. After also claiming increased exemptions of $4,400, petitioners requested reversal and repayment of $247,415.60 of Federal income taxes. Their refund request was denied.

## XI. Notice of Deficiency and Petition

Respondent issued to petitioners a notice of deficiency with respect to their 2005 through 2007 Federal income taxes. As relevant here, respondent allowed petitioners a $750,000 short-term capital loss for 2007 under section 165(g) but

---

[7]Calculated as $744,466.25 minus the $100 limitation imposed by sec. 165(h)(1) minus 10% of petitioners' adjusted gross income as reported on the original return ($101,102.89) imposed by sec. 165(h)(2).

limited the allowable loss for that year to $3,000 under section 1211(b) and allowed

petitioners a $747,000 capital loss carryover under section 1212(b).[8]  In response to

the notice of deficiency, petitioners petitioned the Court.

OPINION

I.    Overview

At issue is whether petitioner's exercise of PCFC nonstatutory stock options

resulted in gross income, and if so, the fair market value of the stock on the exercise

date.  Respondent asserts that the fair market value of PCFC stock on the exercise

date was $3 per share and that petitioners must include as gross income the fair

market value of the stock acquired, $750,000, less the options purchase price,

$5,533.75, or $744,466.25 under section 83(a).[9]  Petitioners mainly contend that the

PCFC stock was worthless on the exercise date and that petitioner was unable to

participate in the market to sell the stock.  Petitioners also assert that respondent

bears the burden of producing reasonable and probative information to support

---

[8]Respondent's determinations in the notice of deficiency with respect to the 2007 capital loss and the capital loss carryover offered no supporting legal analysis. Respondent asserts on brief that the loss and the loss carryover were allowed due to the worthlessness of the PCFC stock in 2007.  On the basis of that concession we determined the relevant Code sections for clarity.

[9]Respondent allowed petitioners a worthless security deduction in the notice of deficiency, and respondent's brief is consistent on this point.

the deficiency because, as petitioners see it, they have raised a reasonable dispute with respect to income reported on Form W-2.

## II. Burdens of Production and Proof

The Commissioner's determinations in a notice of deficiency are generally presumed correct, and taxpayers bear the burden of proving those determinations wrong. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Section 6201(d) may modify the presumption of correctness where an information return, such as a Form W-2, serves as the basis for the deficiency determination. Under that section, where taxpayers assert a reasonable dispute with respect to income reported on an information return and fully cooperate with the Commissioner, the burden of production is upon the Commissioner to adduce reasonable and probative information in addition to the information return. See sec. 6201(d).

We conclude that respondent has met his burden of producing reasonable and probative information with respect to the deficiency. Attached to the 2006 return was a copy of the Form W-2 that PCHLI issued to petitioner. In addition to other documents, the parties stipulated historical sales data of PCFC stock, agreements relating to the exercise of the options, and the original return reporting the value of PCFC stock as $3 per share. When taken as a whole, these documents are reasonable, probative, and supporting of the determination that the fair market

value of PCFC stock was $3 per share. Since respondent has met his burden of production, the burden of persuasion lies with petitioners to show that respondent's determinations are erroneous.[10]

III.    Income From Exercise of Options

    A.    Applicability of Section 83

Section 83(a) generally provides that where property is transferred to a taxpayer in connection with the performance of services, the fair market value of the property at the first time the rights of the person having the beneficial interest in the property are transferable or not subject to a substantial risk of forfeiture, less the amount paid for the property, is includable in the taxpayer's gross income. See Tanner v. Commissioner, 117 T.C. 237, 241 (2001), aff'd, 65 Fed. Appx. 508 (5th Cir. 2003). Where a taxpayer receives a nonqualified stock option without a readily ascertainable fair market value, mere receipt of the option is generally a nontaxable event. See sec. 83(e)(3). Instead, the taxpayer is taxed upon his or her exercise of the option and receipt of the shares where two conditions are met: First, where the shares are transferred to the taxpayer such that he or she acquires beneficial ownership interest therein. See sec. 1.83-3(a)(1), Income Tax Regs. Second,

---

[10]Petitioners do not assert, nor does the record establish, that the burden of proof as to factual matters should shift to respondent under sec. 7491(a).

where the shares are substantially vested in the taxpayer such that they are transferable or not subject to a substantial risk of forfeiture. See sec. 1.83-3(b), Income Tax Regs. Where both conditions are met the taxpayer must recognize gross income in the amount by which the fair market value of the shares exceeds the exercise price paid to acquire them. See sec. 83(a). Each element for income inclusion is met here.

Petitioner acquired beneficial ownership of the shares of PCFC stock when he exercised the options in 2006 and the shares were transferred to him. He paid for the shares and obtained legal title to them; he was entitled to receive dividends; and he bore the risk of loss. See Racine v. Commissioner, T.C. Memo. 2006-162, 92 T.C.M. (CCH) 100, 102 (2006), aff'd, 493 F.3d 777 (7th Cir. 2007); see also sec. 1.83-3(a), Income Tax Regs. The record does not establish that petitioner's right to full enjoyment of the shares was limited but for their status as restricted securities. Such a restriction affects neither the timing of income inclusion nor the amount of income to be included under section 83. See Hilen v. Commissioner, T.C. Memo. 2005-226, 90 T.C.M. (CCH) 333, 335 (2005) (rejecting taxpayer's argument that shares of stock acquired through the exercise of nonstatutory options were nontransferable and subject to a substantial risk of forfeiture because of a restrictive legend on the stock certificates).

The shares of PCFC stock were substantially vested in petitioner because they were not subject to a substantial risk of forfeiture. The rights of a taxpayer in property are subject to a substantial risk of forfeiture where the individual's rights to full enjoyment are conditioned on the future performance of substantial services by any person. Sec. 83(c)(1). The record does not suggest, and petitioners do not assert, that petitioner's right to full enjoyment of his shares was conditioned on the future performance of services. We conclude that the PCFC shares substantially vested in petitioner when he exercised the options. Under section 83(a), petitioners must include in gross income the difference between the fair market value of the 250,000 shares of PCFC stock on the exercise date and the amount petitioner paid for the stock on that date. The parties agree that petitioner paid $5,533.75 to acquire the PCFC stock, but they disagree over the fair market value of PCFC stock on the exercise date.

### B. Fair Market Value of PCFC Stock

#### 1. Parties' Arguments

Respondent, though he does not explicitly state so, advocates a market comparison approach by contending that the fair market value of PCFC stock can be determined from comparable sales surrounding the exercise date. Petitioners focus mainly on petitioner's subjective belief of the price of PCFC stock on the exercise

date, but they do not buttress their position with expert opinion on the value of PCFC stock. We will sustain respondent's determination that the fair market value of PCFC stock on the exercise date was $3 per share.

### 2. Guiding Principles

Fair market value is defined for Federal tax purposes as the price at which property would change hands between a willing buyer and a willing seller, neither being under a compulsion to buy or to sell and both having reasonable knowledge of all the relevant facts. United States v. Cartwright, 411 U.S. 546, 551 (1973) (citing sec. 20.2031-1(b), Estate Tax Regs.); Bank One Corp. v. Commissioner, 120 T.C. 174, 304-306 (2003), aff'd in part, vacated in part and remanded sub nom. J.P. Morgan Chase & Co. v. Commissioner, 458 F.3d 564 (7th Cir. 2006). The fair market value of property is a question of fact to be gleaned from the entire record in the light of well-settled valuation principles. See Tripp v. Commissioner, 337 F.2d 432, 434 (7th Cir. 1964), aff'g T.C. Memo. 1963-244. Property is considered to have no fair market value only in rare and extraordinary circumstances. Schulman v. Commissioner, 93 T.C. 623, 638 (1989); sec. 1.1001-1(a), Income Tax Regs.

When valuing nonpublicly traded stock for Federal tax purposes, arm's-length sales of reasonable amounts of like stock proximate to the valuation date

may be probative of fair market value so long as the buyer and seller are each informed and neither is acting under a compulsion to buy or sell. See Estate of Noble v. Commissioner, T.C. Memo. 2005-2, 89 T.C.M. (CCH) 649, 652 (2005); see also In re Prince, 85 F.3d 314, 320 (7th Cir. 1996) (the price that an arm's-length buyer would be willing to pay--and that sellers are willing to accept--for stock on the open market is generally the best means of gauging the stock's present value); Estate of Fitts v. Commissioner, 237 F.2d 729, 731 (8th Cir. 1956), aff'g T.C. Memo. 1955-269. The best indicium of nonpublicly traded stock's fair market value is often the price at which the stock is sold on a stock exchange, over-the-counter market, or otherwise. Dellacroce v. Commissioner, 83 T.C. 269, 288 (1984); cf. sec. 20.2031-2(b)(1), Estate Tax Regs. (fair market value of stock sold within a reasonable period before and after the valuation date is the weighted average of the means between the highest and lowest selling price on the nearest date before and after the valuation date).

### 3. Fair Market Value of PCFC Stock

We begin our discussion of the fair market value of PCFC stock by noting an evidentiary void caused by each party's failure to call an expert witness on the matter. Expert witness testimony, while certainly not determinative of value, may prove helpful in assisting the Court to understand areas requiring specialized

knowledge, experience, training, or judgment.  See Fed. R. Evid. 702.  Petitioners bear the burden of proving the fair market value of PCFC stock, see Morris v. Commissioner, 70 T.C. 959, 988 (1978), and that burden is steepened in the absence of reliable and reasonable expert opinion on the point in question.

PCFC stock was traded in an over-the-counter market in which FBR, as the market maker, reported prices resulting from a bid-ask process.  We regard FBR's report as reliable in the light of their status as a member of the NASD and NASDAQ.  Within the three-month period surrounding the exercise date (i.e., between June 30 and December 18, 2006), PCFC stock was traded in six transactions.[11]  Five of those trades settled at $3 per share and one closed at $2 per share.  Among the trades FBR facilitated less than one month after the exercise date on October 16, 2006, was the settlement of 254,800 shares of PCFC stock at $3 per share.  We look to the October 16 trade as eminently probative of the fair market value of petitioner's PCFC stock given the closeness in volume (254,800 shares traded as compared with 250,000 shares owned).  On the date immediately preceding the exercise date (September 21, 2006), FBR also traded 6,900 shares of PCFC stock for $3 per share.  Given that the trading price of PCFC stock remained

---

[11]We select a three-month window as reasonably proximate to the exercise date.

constant as to date ($3 per share on each of September 21 and 22, 2006), and as to volume ($3 per share on trades of 6,900 and 254,800), we accept respondent's conclusion that the fair market value of PCFC stock on the exercise date was $3 per share.[12]

Whereas isolated stock sales may not be a reliable measure of fair market value in the face of contrary evidence, see Duncan Indus., Inc. v. Commissioner, 73 T.C. 266, 278 (1979), petitioners have not introduced evidence casting doubt on the sales which FBR facilitated other than petitioner's self-serving trial testimony. We scrutinize carefully unsubstantiated testimony of interested parties. See Tokarski v. Commissioner, 87 T.C. 74, 77 (1986). In this case, we decline to credit petitioner's testimony absent corroborating evidence. Petitioners have offered no expert opinion evidence on the matter. They did not introduce a copy of the Form S-11 registration statement filed with the SEC in June 2006 establishing the primary offering price, though petitioner testified that his decision to exercise the options was based in part on the fact that the form was filed. Nor

---

[12]Although the book value of PCFC stock alone is not a reliable measure of fair market value, see Biaggi v. Commissioner, T.C. Memo. 2000-48, 79 T.C.M. (CCH) 1488, 1490 (2000), aff'd, 8 Fed. Appx. 66 (2d Cir. 2001), we note that the $3 fair market value fits squarely within the book value range for yearend 2005 ($5.62) and yearend 2006 ($1.81).

have petitioners shown that the committee determined the price of PCFC stock to be other than that reported by FBR or as reported in the Form W-2.

Contrary to petitioner's assertions, we read little (if anything) of his failed attempts at selling the PCFC stock. Petitioners claim on brief that petitioner was unable to participate in the "limited" market for PCFC stock because the market, insofar as it was restricted to "qualified" buyers and sellers, was not open to him. We find a peculiar inconsistency in petitioners' statements on brief and representations that petitioner made to PCFC concerning SEC rule 144 under the 1933 Act. Petitioners claim on brief that petitioner "quickly" came to understand the limited market for PCFC stock, yet he represented to PCFC approximately six months earlier that he understood that public resale of the PCFC stock was not allowed until expiration of a holding period of at least one year. His claimed inability to sell 250,000 shares of PCFC stock is further called into doubt given that 254,800 shares of PCFC stock were sold on October 16, 2006; precisely the time when he tried to sell his shares. We think the better view is that the limited market of which petitioner speaks arises under the securities law and the status as PCFC stock as restricted securities, not simply because of a lack of prospective buyers.

Equally unpersuasive is petitioners' contention that allegedly fraudulent behavior on the part of Mr. Kornswiet compels a different result. Petitioner is college educated, he has at least 30 years of experience in the mortgage industry, and he has been a mortgage underwriter during part of his career. We observe that mortgage underwriters routinely assess the financial soundness of lendees for purposes of evaluating risk. Moreover, petitioner represented that he acquired the information necessary to make an "informed and knowledgeable decision" with respect to his acquisition of PCFC stock. He also testified that he recognized that the nonprime mortgage industry was "going through a little bit of turmoil" in late 2006 but that he believed that flux to be "cyclical". We conclude on the basis of the foregoing that petitioner recognized the risk associated with buying PCFC stock, but he either ignored or miscalculated that risk. Petitioners, by virtue of respondent's concession, are entitled to a worthless stock deduction for petitioner's misjudgment. Petitioners may not, however, invalidate the exercise of the options simply because hindsight reveals that the investment was unprofitable.

4. Subsequent Events

Petitioners contend that the PCFC stock was worthless on the exercise date as evidenced by PCFC's bankruptcy six months later. Implicit in their argument is that subsequent events fix the fair market value of PCFC stock at less than $3 per

share.  The Court of Appeals for the Seventh Circuit, the court to which an appeal of this case most likely lies, has held that subsequent events should not be used to determine fair market value, except to the extent that they were reasonably foreseeable on the valuation date.  First Nat'l Bank of Kenosha v. United States, 763 F.2d 891, 894 (7th Cir. 1985).  We decline to conclude on the limited record before us that PCFC's bankruptcy and the worthlessness of its stock were reasonably foreseeable events on the exercise date.

To be sure, PCFC's financial statements showed a company in dire financial straits but not one incapable of reversal.  Petitioner's trial testimony was consistent on this point in that he stated his understanding in late 2006 that the nonprime mortgage industry was experiencing a downward trend of a normal business cycle.  Petitioner misplaces reliance on the bankruptcy court's determination that PCFC was insolvent as early as December 2004.  The bankruptcy court found that PCFC was insolvent at that time "under analyses prescribed by the Bankruptcy Code and California Civil Code when analyzing fraudulent transfers".  The mere fact that a corporation may be insolvent does not necessarily render its stock worthless, see id.; Morton v. Commissioner, 38 B.T.A. 1270, 1278-1279 (1938), aff'd, 112 F.2d 320 (7th Cir. 1940), because that stock may have liquidating value or potential value, see Austin Co. v. Commissioner, 71 T.C. 955, 970 (1979).  Petitioners have

failed to establish that PCFC's insolvency was not reflected in the loss of more than 70% of its stock value between January 2005 and the exercise date. Nor did they prove that the worthlessness of PCFC stock was reasonably foreseeable on the valuation date. The failure of proof is borne by petitioners.

5.   Conclusion

Bearing in mind that the price of stock in a liquid market is presumptively the one to use in judicial proceedings, see Metlyn Realty Corp. v. Esmark, Inc., 763 F.2d 826, 835 (7th Cir. 1985), and presented with no reliable evidence from petitioners to the contrary, we sustain respondent's determination that the fair market value of PCFC stock on the exercise date was $3 per share.[13] Given that holding, it follows that petitioners must include in gross income the difference between the fair market value of the stock on the exercise date ($750,000) less the amount that petitioner paid to acquire the stock ($5,533.75) or $744,466.25. See sec. 83(a). Because petitioners reported this amount as gross income on the original return and paid the accompanying tax through withholding, they are not entitled to a refund of the tax paid. Respondent has conceded, and we will uphold, that

---

[13]Petitioners do not assert, nor does the record establish, that discounts should be applied to the PCFC stock for lack of marketability, minority interest, or blockage.

petitioners are entitled to a worthless stock deduction for 2007 under section 165(g) and a $747,000 capital loss carryover under section 1212(b).

In reaching our decision, we have considered all arguments made, and to the extent that we have not specifically addressed them, we conclude that they are without merit or are irrelevant.

To reflect the foregoing and the parties' concessions,

<u>Decision will be entered</u>

<u>under Rule 155</u>.